[No. S172199. June 7, 2010.]

FORD GREENE, Plaintiff and Appellant, v.
MARIN COUNTY FLOOD CONTROL AND WATER CONSERVATION
DISTRICT, Defendant and Respondent;
FLOOD MITIGATION LEAGUE OF ROSS VALLEY et al., Interveners
and Respondents.

## Counsel

Ford Greene, in pro. per., for Plaintiff and Appellant.

Jack Cohen as Amicus Curiae on behalf of Plaintiff and Appellant.

Trevor A. Grimm, Jonathan M. Coupal and Timothy A. Bittle for Howard Jarvis Taxpayers Association as Amicus Curiae on behalf of Plaintiff and Appellant.

Patrick K. Faulkner, County Counsel, Sheila Shah Lichtblau, Deputy County Counsel; Colantuono & Levin, Michael G. Colantuono and Erwin M. Benedicto for Defendant and Respondent.

Daniel S. Hentschke for California Water Agencies, California Special Districts Association, California State Association of Counties and League of California Cities as Amici Curiae on behalf of Defendant and Respondent.

Ogletree, Deakins, Nash, Smoak & Stewart and Thomas M. McInerney for Interveners and Respondents.

## Opinion

**MORENO, J.**—In this case, a flood control district proposed a storm drainage fee to fund improvements intended to prevent flooding and flood damage. Pursuant to article XIII D, section 6 of the California Constitution,[1] enacted as part of Proposition 218 in 1996, the fee was voted on by the property owners in the district, and obtained the needed majority. One property owner challenged the legality of the election, a challenge that, after various iterations, came down to this: the ballots were not secret, because the ballot contained on its face the name and address of the voter, and required the voter to sign the ballot, so that inspection of the ballot would reveal how the person voted. Although the procedures enacted by the flood control district provided that the ballots would remain secret before tabulation and would be revealed for inspection after tabulation only pursuant to a court order, it was argued, and the Court of Appeal held, that these measures were insufficient. Although article XIII D is silent on the matter of ballot secrecy, article II, section 7 guarantees a secret ballot in elections, and the Court of Appeal concluded that the latter article was fully applicable to fee elections

---

[1] All references to articles are to the California Constitution unless otherwise indicated.

conducted pursuant to article XIII D, section 6. The Court of Appeal further concluded that secrecy provisions adopted by the district were inadequate, and that, when a voter is asked to vote on a ballot that reveals his or her identity, article II requires that he or she receive explicit assurances that the ballot will remain secret. The Court of Appeal therefore overturned the election result.

We disagree with the Court of Appeal. As explained below, article XIII D, section 6, while incorporating various measures to preserve secrecy, does not incorporate wholesale the ballot secrecy requirements of article II, section 7, and does not require the kind of assurances the Court of Appeal opinion contemplated. We therefore reverse the Court of Appeal and reinstate the election result.

## I. Factual and Procedural Background

In 2007, the Marin County Flood Control and Water Conservation District (District) proposed a new storm drainage fee to be imposed on the owners of property within Zone 9 of the District (Ross Valley), which includes all or part of Larkspur, Ross, San Anselmo, Fairfax, and surrounding communities. The area had a 50-year history of chronic flooding, which included a flood on or about December 31, 2005, that allegedly caused over $100 million in damage. According to the Storm Drainage Fee Report (Report) authorized by the District, this was a 100-year storm, meaning there was a 1 percent chance that a storm of that severity would happen in a given year. The area had also experienced 100-year storms in 1982 and 1986. Much of Ross Valley, according to the Report, provides only for five-year flood protection, meaning that it could be overwhelmed by a storm that has a 20 percent chance of occurring in a given year.

In response to the threat of future storm damage, various government officials and citizen groups developed a proposal for a fee to fund flood control improvements. The proposal, articulated in the Report, prescribed measures such as removing various constrictions that block the creeks and adding upstream detention basins to hold and release water gradually. The Report arrived at a cost estimate for these improvements and devised a fee methodology, with the amount of the fee a property owner would be required to pay varying according to the size and type of the parcel. Interveners Flood Mitigation League of Ross Valley and Friends of the Corte Madera Creek Watershed participated in this process.

The District's board, the Marin County Board of Supervisors (Board), accepted the Report, adopted written protest procedures pursuant to article XIII D, section 6, scheduled a public hearing on the fee for May 1, 2007, at which protests to the fee election could be registered pursuant to article XIII D, section 6, subdivision (a), and directed the mailing of notices to affected property owners. On May 1, the Board declared by resolution that there was no majority protest at the public hearing and called a "special election" on the fee "to be held on Monday, June 25, 2007, solely by mailed ballot, pursuant to and in accordance with article XIII D, section 6 and the procedures . . . attached hereto."

The ballot mailed by the District to property owners consisted of cardstock that stated the instructions for filling out the ballot on one side and the actual ballot on the other. The instructions specified that the ballots were to be signed. The actual ballot contained the name and address of the property owner, the exact amount of the annual fee to be imposed on the property owner, the statement of the question to be voted on, yes and no check boxes, and designated spaces for the voter's printed name, signature, and the date.

An Exhibit A to the District Board's resolution adopted local rules for the election. Those rules provided that the election was to be conducted by mail, that the Clerk of the Board of Supervisors of Marin County was to date stamp the return envelopes of the unopened ballots as they were received and place them in a secure container or "lock box." The ballots were to be opened only after all the ballots were due on June 25, 2007, at 5:01 p.m. It was further specified that only the clerk and deputy clerks were to have access to the ballots, and that they were not to disclose how a particular voter voted, unless required to do so by a court order.

The official canvass of the votes showed 8,059 total ballots cast: 3,208 yes votes; 3,143 no votes; 1,708 invalidated votes. On July 10, 2007, the Board by resolution declared that the measure had passed. On July 17, 2007, the Board adopted an ordinance implementing the fee.

On July 16, 2007, "Ford" Greene, a property owner in the District who voted in the election, demanded a recount of the election results pursuant to Elections Code section 15620. The record does not include any written response to the recount demand or any official declaration of the results of a recount. On August 9, 2007, Greene filed a "Verified Complaint for an Election Contest" pursuant to Elections Code section 16100 et seq. The District answered and, pursuant to the trial court's authorization, Flood

Mitigation League of Ross Valley and Friends of the Corte Madera Creek Watershed filed their complaint in intervention, joining the District in opposing appellant's election contest complaint.

The crux of Greene's complaint was that the notice given to the voters did not adequately inform them that they were required to sign the ballot, because the warning was inconspicuously placed in small type and was not in boldface. He alleged that as a result of this defect, 1,648 ballots were invalidated for lack of signature, approximately 21 percent of the votes cast, in contrast to the usual 1 percent invalidation rate in Marin County elections. This inadequate notice required that the election contest be set aside, or that there be a recount that would include the unsigned ballots. The District denied the allegations in its answer to the complaint. At a September 7, 2007 case management hearing, the parties stipulated that the court could determine Greene's election challenge solely on the pleadings and on the face of the ballot and waived an evidentiary hearing.

Meanwhile, the Flood Mitigation League of Ross Valley and the Friends of the Corte Madera Creek Watershed filed a complaint in intervention on August 14, 2007, requesting declaratory relief declaring the election to be lawful. In his answer to the complaint in intervention, Greene raised as one of his affirmative defenses that the requirement that voters sign their ballots violated the ballot secrecy requirement of article II, section 7.

The trial court rejected the argument, concluding that the requirement to sign ballots was expressly authorized by article XIII D and by Government Code section 53753. The court further ruled that the notice to voters of the signature requirement was sufficient. The trial court denied the election contest in its entirety.

On appeal, the Court of Appeal redefined the issue to be decided. Although initially challenging the signature requirement per se, "Greene clarified at oral argument, and in his appellate briefs, and the record of the trial court proceedings confirm, that his central legal argument in this litigation has always been that article II, section 7's secret voting requirement applies to an article XIII D, section 6(c) fee election."

The Court of Appeal reversed the trial court. First the court concluded, for reasons elaborated below, that the secret voting requirement did in fact apply to the election at issue. It then concluded that the District's procedures did not adequately protect voter secrecy: Although the District's election procedures may have actually provided sufficient secrecy, the Court of Appeal

concluded, as explained at greater length below, that the voters were not given adequate assurances that their ballots would be kept secret, and therefore were for all intents and purposes deprived of a secret ballot.

We granted review to clarify the election secrecy requirements, if any, imposed by article XIII D, section 6. Before proceeding to the merits, we discuss the underlying constitutional and statutory scheme.

## II. PROPOSITION 218 AND GOVERNMENT CODE SECTION 53753

The Court of Appeal in *Howard Jarvis Taxpayers Assn. v. City of Riverside* (1999) 73 Cal.App.4th 679, 681–682 [86 Cal.Rptr.2d 592] usefully summarized the purpose of Proposition 218: "Proposition 218 can best be understood against its historical background, which begins in 1978 with the adoption of Proposition 13. 'The purpose of Proposition 13 was to cut local property taxes. [Citation.]' [Citation.] Its principal provisions limited ad valorem property taxes to 1 percent of a property's assessed valuation and limited increases in the assessed valuation to 2 percent per year unless and until the property changed hands. (Cal. Const., art. XIII A, §§ 1, 2.)

"To prevent local governments from subverting its limitations, Proposition 13 also prohibited counties, cities, and special districts from enacting any special tax without a two-thirds vote of the electorate. (Cal. Const., art. XIII A, § 4; *Rider* v. *County of San Diego* (1991) 1 Cal.4th 1, 6–7 [2 Cal.Rptr.2d 490, 820 P.2d 1000].) It has been held, however, that a special assessment is not a special tax within the meaning of Proposition 13. (*Knox* v. *City of Orland* (1992) 4 Cal.4th 132, 141 [14 Cal.Rptr.2d 159, 841 P.2d 144], and cases cited.) Accordingly, a special assessment could be imposed without a two-thirds vote.

■ "In November 1996, in part to change this rule, the electorate adopted Proposition 218, which added articles XIII C and XIII D to the California Constitution. Proposition 218 allows only four types of local property taxes: (1) an ad valorem property tax; (2) a special tax; (3) an assessment; and (4) a fee or charge. (Cal. Const., art. XIII D, § 3, subd. (a)(1)–(4); see also Cal. Const., art. XIII D, § 2, subd. (a).) It buttresses Proposition 13's limitations on ad valorem property taxes and special taxes by placing analogous restrictions on assessments, fees, and charges."

Proposition 218's findings and declarations state: "The people of the State of California hereby find and declare that Proposition 13 was intended to provide effective tax relief and to require voter approval of tax increases. However, local governments have subjected taxpayers to excessive tax, assessment, fee and charge increases that not only frustrate the purposes of

voter approval for tax increases, but also threaten the economic security of all Californians and the California economy itself. This measure protects taxpayers by limiting the methods by which local governments exact revenue from taxpayers without their consent." (Prop. 218, § 2; Stats. 1996, p. A-295; also reprinted at Historical Notes, 2A West's Ann. Cal. Const. (2010 supp.) foll. art. 13 C, § 1, p. 110.) It also states: "The provisions of this act shall be liberally construed to effectuate its purposes of limiting local government revenue and enhancing taxpayer consent." (Prop. 218, § 5.)

Article XIII D, enacted as part of Proposition 218, specifically addresses the means by which local government agencies may impose assessments and property-related fees. " 'Assessment' means any levy or charge upon real property by an agency for a special benefit conferred upon the real property. 'Assessment' includes, but is not limited to, 'special assessment,' 'benefit assessment,' 'maintenance assessment' and 'special assessment tax.' " (Art. XIII D, § 2, subd. (b).) " 'Fee' or 'charge' means any levy other than an ad valorem tax, a special tax, or an assessment, imposed by an agency upon a parcel or upon a person as an incident of property ownership, including a user fee or charge for a property related service." (*Id.*, § 2, subd. (e).)

Article XIII D, section 4 sets forth in considerable detail the procedures for adopting assessments. Assessments are levied in proportion to the special benefit conferred on a parcel (*id.*, § 4, subd. (a)), as calculated in an engineer's report (*id.*, subd. (b)), and each affected property owner must receive detailed notice about the assessment (*id.*, subd. (c)). Subdivision (d) provides: "Each notice mailed to owners of identified parcels within the district pursuant to subdivision (c) shall contain a ballot which includes the agency's address for receipt of the ballot once completed by any owner receiving the notice *whereby the owner may indicate his or her name, reasonable identification of the parcel, and his or her support or opposition to the proposed assessment.*" (Italics added.)

Subdivision (e) provides: "The agency shall conduct a public hearing upon the proposed assessment not less than 45 days after mailing the notice of the proposed assessment to record owners of each identified parcel. At the public hearing, the agency shall consider all protests against the proposed assessment and tabulate the ballots. The agency shall not impose an assessment if there is a majority protest. A majority protest exists if, upon the conclusion of the hearing, ballots submitted in opposition to the assessment exceed the ballots submitted in favor of the assessment. In tabulating the ballots, the ballots shall be weighted according to the proportional financial obligation of the affected property."

Article XIII D, section 6, concerning property-related fees, provides a somewhat different procedure. Once the amount of the fee per parcel is calculated, the agency must provide written notice to each affected property owner and the opportunity to protest the fee. At the public hearing, the government agency is to tabulate all the written protests to the proposed fee, and if a majority of owners of the identified parcels protests, the fee will not be imposed. (Art. XIII D, § 6, subd. (a).)

If, however, there is no majority protest, the proposed fee is put before the voters for approval. Subdivision (c) sets forth the manner of conducting such an election and states in full: "Except for fees or charges for sewer, water, and refuse collection services, no property related fee or charge shall be imposed or increased unless and until that fee or charge is submitted and approved by a majority vote of the property owners of the property subject to the fee or charge or, at the option of the agency, by a two-thirds vote of the electorate residing in the affected area. The election shall be conducted not less than 45 days after the public hearing. *An agency may adopt procedures similar to those for increases in assessments in the conduct of elections under this subdivision.*" (Italics added.)

After passage of Proposition 218, the Legislature passed in 1997 Government Code section 53750 et seq.,[2] designed to clarify the implementation of Proposition 218. (Stats. 1997, ch. 38, § 5, p. 366.) Section 53753 addressed the procedures for protesting assessments. As originally enacted, section 53753 contained no provisions for assessment ballot secrecy. The statute provided that "[e]ach assessment ballot shall be signed and either mailed or otherwise delivered to the address indicated on the assessment ballot." (Former § 53753, subd. (c), as enacted by Stats. 1997, ch. 38, § 5, pp. 366, 369.) It further provided that "[t]he majority protest proceedings described in this subdivision shall not constitute an election or voting for purposes of Article II of the California Constitution or of the California Elections Code." (*Id.*, subd. (e)(4), as enacted by Stats. 1997, ch. 38, § 5, pp. 366, 370.)

Section 53753 was amended in 2000 to provide for a certain measure of assessment ballot secrecy. According to the legislative history, the amendment was initiated by the Howard Jarvis Taxpayers Association, the original sponsors of Proposition 218. The impetus for the amendment was the practice in some cities of putting pressure on property owners to change their votes after they had submitted their ballots but before the deadline for submitting ballots. (Assem. Com. on Local Government, Analysis of Sen. Bill No. 1477 (1999–2000 Reg. Sess.) as amended May 9, 2000, p. 2.) On the other hand,

---

[2] All statutory references are to this code unless otherwise indicated.

the legislative history reveals that earlier, unsuccessful legislative attempts to protect the secrecy of assessment ballots were viewed as too extreme. (*Ibid.*)

Instead, the 2000 amendment made clear that ballot secrecy was to be preserved before the assessment ballots were tabulated, but that the ballots were to be made public records thereafter. Section 53753, subdivision (c), as amended in 2000, therefore now provides in pertinent part: "Assessment ballots shall remain sealed until the tabulation of ballots pursuant to subdivision (e) commences, provided that an assessment ballot may be submitted, or changed, or withdrawn by the person who submitted the ballot prior to the conclusion of the public testimony on the proposed assessment at the hearing required pursuant to subdivision (d)." Section 53753, subdivision (e) provides in pertinent part: "At the conclusion of the public hearing conducted pursuant to subdivision (d), an impartial person designated by the agency who does not have a vested interest in the outcome of the proposed assessment shall tabulate the assessment ballots submitted, and not withdrawn, in support of or opposition to the proposed assessment. . . . [¶] . . . During and after the tabulation, the assessment ballots . . . *shall be treated as disclosable public records*, as defined in Section 6252, and equally available for inspection by the proponents and the opponents of the proposed assessment." (Italics added.)

Most of the other original provisions of section 53753, including the requirement that ballots be signed and the proviso that these procedures are not elections within the meaning of article II, were not modified by the 2000 amendment and remain in force today.

## III. Discussion

We review questions of law about the meaning of Proposition 218, as other questions of law, de novo. (*Apartment Assn. of Los Angeles County, Inc. v. City of Los Angeles* (2001) 24 Cal.4th 830, 836 [102 Cal.Rptr.2d 719, 14 P.3d 930].)

Here, article II, section 7, provides that "[v]oting shall be secret." The " 'right to a secret ballot . . . is the very foundation of our election system.' " (*Scott v. Kenyon* (1940) 16 Cal.2d 197, 201 [105 P.2d 291].) The right is " 'an important and valuable safeguard for the protection of the voter, and particularly the humble citizen, against the influence which wealth and situation may be supposed to exercise.' " (*Robinson v. McAbee* (1923) 64 Cal.App. 709, 714 [222 P. 871].)

■ Yet although these secrecy requirements have been applied scrupulously to candidate elections and to initiatives and referenda, elections outside these traditional electoral areas have not invariably been governed by the constitutional right of secrecy. Thus in *Alden v. Superior Court* (1963) 212 Cal.App.2d 764, 770 [28 Cal.Rptr. 387] (*Alden*), the court concluded that an election to form a water district was not bound by the constitutional secrecy requirements of the predecessor to article II, section 7: "The creation of such a district is a legislative act, and the Legislature may enact conditions, upon the performance of which the district shall be regarded as organized." The court cited *Tarpey v. McClure* (1923) 190 Cal. 593 [213 P. 983] (*Tarpey*), in which the court upheld the constitutionality of the Water Storage District Act of 1921, which provided for a formation election in which only property owners were entitled to vote, and each voter was given one vote for each $100 worth of his land. The *Tarpey* court concluded that this act did not violate the right to vote then provided in former article II, section 1, by denying "to any but land owners the right to vote at district elections. . . . [I]t is now clear, in the light of the later decisions, that those provisions of the constitution 'refer to the qualification of electors entitling them to vote at the ordinary elections, local and general, held in the course of the usual functions of civil government.' [Citations.] '. . . The formation of this and similar districts is a function pertaining purely to the legislative branch of the government. Wherefore it may do so by giving such persons as it may think best an opportunity to be heard.' " (*Tarpey, supra,* at p. 606.) For the same reason, it denied a challenge to the act based on the constitutional right to a secret ballot. (*Ibid.*)

The question is whether and to what extent the right to vote in secret set forth in article II, section 7 applies to the voting procedures set forth in a different and more recently enacted constitutional provision, article XIII D, section 6. To answer this question we first examine the relevant constitutional language.

Whereas section 4 of article XIII D and section 53753 provide in considerable detail the procedures for obtaining and tabulating assessment ballots, the description of the procedures for fee elections under article XIII D, section 6 is quite brief: That section merely provides that a fee or charge must be submitted and approved either "by a majority vote of the property owners of the property subject to the fee or charge or, at the option of the agency, by a two-thirds vote of the electorate residing in the affected area." (*Id.,* subd. (c).) It further states: "An agency may adopt procedures similar to those for increases in assessments in the conduct of elections under this subdivision." (*Ibid.*)

To determine whether secrecy requirements apply to fee elections, we therefore first turn to the procedures for assessment balloting to determine whether and to what extent assessment balloting requires secrecy. As the Court of Appeal recognized, although Proposition 218 is silent on the secrecy issue, "[s]everal of the requirements suggest a nonsecret vote. The ballot must be one 'whereby the owner may indicate his or her name, reasonable identification of the parcel, and his or her support or opposition to the proposed assessment,' which suggests that these three pieces of information will appear on a single piece of paper in contrast to the typical election ballot that does not identify the voter. (Art. XIII D, § 4, subd. (d).) The ballots must be tabulated '[a]t the public hearing,' which suggests the information on the ballot might become public at the hearing. (Art. XIII D, § 4, subd. (e).) Finally, ballots must be 'weighted according to the proportional financial obligation of the affected property,' which requires the person actually tabulating the ballots to take the identity of the parcel (and thus of the property owner) into account, again suggesting a nonsecret procedure."

The Court of Appeal nonetheless concluded that the question of whether or not section 4 requires secret voting is unclear. It reasoned that "an agency could comply with article XIII D, section 4 while maintaining secrecy in voting. The information on the ballot need not be publicly disclosed at the public hearing. The persons tabulating the ballots could use the information on the ballot (even if all gathered on a single piece of paper) to validate, weight, and count the ballots but keep the information confidential in the absence of a challenge to the balloting resulting in a court disclosure order. Indeed, this was the procedure prescribed for the District's fee election under the Election Procedures.

"Alternatively, the voter and parcel identifying information could be placed on the outside of an envelope that contains the ballot, in the manner of absentee voting. (See Elec. Code, §§ 3010–3011.) The voter's qualification could then be confirmed and the weight to be accorded the ballot calculated before the ballot was opened. There would need to be a mechanism to associate the actual vote with the weight of the ballot, but this could be done using computer coding to avoid public disclosure of any individual property owner's vote (i.e., the association of a particular voter to a particular vote would be hidden within the computer databank unless ordered disclosed on a challenge to the balloting) or by some other mechanism strictly limiting the disclosure of information that would link the identity of a voter to a yes or no vote."

■ But the question is not whether assessment balloting under article XIII D, section 4 *could* be done in a manner that protects secrecy. The question rather is whether section 4 requires secrecy. To address that question, we first review certain basic tenets of constitutional construction. " 'The

principles of constitutional interpretation are similar to those governing statutory construction. In interpreting a constitution's provision, our paramount task is to ascertain the intent of those who enacted it. [Citation.] To determine that intent, we "look first to the language of the constitutional text, giving the words their ordinary meaning." [Citation.] If the language is clear, there is no need for construction. [Citation.] If the language is ambiguous, however, we consider extrinsic evidence of the enacting body's intent.' " (*Professional Engineers in California Government v. Kempton* (2007) 40 Cal.4th 1016, 1037 [56 Cal.Rptr.3d 814, 155 P.3d 226].)

Moreover, "[r]udimentary principles of construction dictate that when constitutional provisions can reasonably be construed so as to avoid conflict, such a construction should be adopted. (*Serrano* v. *Priest* (1971) 5 Cal.3d 584, 596 [96 Cal.Rptr. 601, 487 P.2d 1241]; see also *Lungren* v. *Deukmejian* (1988) 45 Cal.3d 727, 735 [248 Cal.Rptr. 115, 755 P.2d 299].) As a means of avoiding conflict, a recent, specific provision is deemed to carve out an exception to and thereby limit an older, general provision. [Citations.]" (*Izazaga v. Superior Court* (1991) 54 Cal.3d 356, 371 [285 Cal.Rptr. 231, 815 P.2d 304].)

As noted, article XIII D, section 4, subdivision (d) provides that the ballot must be one "whereby the owner may indicate his or her name, reasonable identification of the parcel, and his or her support or opposition to the proposed assessment," which, as the Court of Appeal correctly observed, suggests that these three pieces of information will appear on a single piece of paper, in contrast to the typical election ballot that does not identify the voter.[3] The provision in section 4, subdivision (e) that the votes be tabulated at a public hearing also weighs in favor of interpreting section 4 to authorize nonsecret voting.

Moreover "[i]n cases of ambiguity we also may consult any contemporaneous constructions of the constitutional provision made by the Legislature or by administrative agencies." (*City and County of San Francisco v. County of San Mateo* (1995) 10 Cal.4th 554, 563 [41 Cal.Rptr.2d 88, 896 P.2d

---

[3] The Court of Appeal properly rejected Greene's argument that the language in the constitutional provision that "the owner *may* indicate his or her name, reasonable identification of the parcel, and his or her support or opposition to the proposed assessment" (art. XIII D, § 4, subd. (d), italics added) means that voter self-identification is voluntary: "Greene argues that the use of the word 'may' in this passage means that the property owner has the choice whether or not to identify him' or herself on the ballot. This is not a reasonable construction of the passage. 'May indicate' applies not only to the voter's name, but also the identity of the parcel and the property owner's vote. Those pieces of information are essential to counting (and weighting) the property owner's vote. Therefore, the use of 'may' in the passage has no more significance than if the passage stated that the agency must provide a ballot whereby the property owner may vote. To the extent it implies voluntariness, it is the choice whether to vote at all. If the property owner wants to cast a vote, he or she must provide the listed information."

181].) "[O]ur past cases establish that the presumption of constitutionality accorded to legislative acts is particularly appropriate when the Legislature has enacted a statute with the relevant constitutional prescriptions clearly in mind. [Citation.] In such a case, the statute represents a considered legislative judgment as to the appropriate reach of the constitutional provision. Although the ultimate constitutional interpretation must rest, of course, with the judiciary (see *Marbury* v. *Madison* (1803) 5 U.S. (1 Cranch) 137, 176–180 [2 L.Ed. 60]), a focused legislative judgment on the question enjoys significant weight and deference by the courts." (*Pacific Legal Foundation v. Brown* (1981) 29 Cal.3d 168, 180 [172 Cal.Rptr. 487, 624 P.2d 1215].)

Here, as discussed, section 53753, enacted specifically to address the just-approved article XIII D, section 4, provides that the provisions of article II, which include in section 7 the ballot secrecy provision at issue here, do not apply to the assessment ballot procedures prescribed in section 4. (§ 53753, subd. (e)(4).) The statute also provides that the ballots must be signed, further indicating that the ballot is not secret. (*Id.*, subd. (c).)[4] Moreover, as discussed, section 53753 was later amended to specifically address voter secrecy requirements, and now provides that the ballots shall be secret before tabulation and public thereafter, but did not alter the voter identification provisions of assessment ballots.

We therefore conclude, based on all the above, that section 4 of article XIII D, sets forth a balloting scheme that authorizes (1) a ballot on which a

---

[4] In supplemental briefing, Greene argued that section 53753, subdivision (c)'s signature requirement is an improper amendment of article XIII D, section 4, subd. (d), relying on our recent case of *People v. Kelly* (2010) 47 Cal.4th 1008 [103 Cal.Rptr.3d 733, 222 P.3d 186]. In *Kelly*, we held that Health and Safety Code section 11362.77, which imposed certain limits on the amount of medical marijuana an individual could possess, was an improper amendment of the Compassionate Use Act of 1996 (Health & Saf. Code, § 11362.5), an initiative statute, which imposed no such limits but permitted eligible persons to possess as much marijuana as was reasonably related to their medical needs. (*Kelly, supra*, at p. 1043.) As we noted in *Kelly*, however, our case law made clear that "the Legislature remains free to enact laws addressing the general subject matter of an initiative, or a 'related but distinct area' of law that an initiative measure 'does not specifically authorize or prohibit.'" (*Id.* at p. 1026, fn. 19, italics omitted.) Here, article XIII D, section 4, subdivision (d) requires someone voting on assessments to "indicate his or her name" but does not specify how this will be done. Section 53753, subdivision (c) makes clear that a signature is one means by which voters must identify themselves. Thus, section 53753, subdivision (c) is consistent with article XIII D, section 4, subdivision (d). Nor does that statute significantly burden or undermine any article XIII D authorization or prohibition. Therefore, it does not constitute an improper legislative amendment of an initiative.

Greene also argues that section 53753, subdivision (e)(4) constitutes an improper amendment by abolishing ballot secrecy. Yet, as discussed, that statute, inasmuch as it pertains to article II, section 7, merely acknowledges that article XIII D, section 4, reasonably read, does not adhere to the secret ballot procedures found in conventional elections.

property owner indicates not only his or her vote, but also his or her name and parcel; (2) public disclosure of the ballots, at least during and after tabulation.

This conclusion does not fully answer the question before us. As discussed, article XIII D, section 6 provides for voter approval of property-related fees in elections in which the sponsoring government agency "may adopt procedures similar to those for increases in assessments," obviously referring to section 4. What does "procedures similar to those for increases in assessments in the conduct of elections under this subdivision" mean in this context? To answer the question we identify precisely the kinds of election or balloting procedures set forth in section 4, governing approval of assessment increases, and which of these may have been incorporated into section 6 elections.

The procedures in article XIII D, section 4 pertaining to the conduct of voting on assessments may be separated into three categories. Subdivision (c) specifies the manner in which the affected property owners will be notified of the assessment. Subdivision (d) prescribes the basic content of the ballot, and requires, as discussed above, voter self-identification. Subdivision (e) prescribes the manner in which a public hearing is conducted, during which the ballots are tabulated.

One would expect the "procedures similar to those for increases in assessments" language in section 6, subdivision (c) to refer to procedures found in section 4 but not in section 6, otherwise there would be no need to refer to the former section. Section 4, subdivision (c)'s notice provisions are similar to those provided in section 6, subdivision (a)(1). Section 6, subdivision (a)(2) has rules for conducting a public hearing at which protests will be considered before an election that are similar to those set forth in section 4, subdivision (e). What section 6 does not have is any provision regarding the composition of the ballot to be sent to property owners in the event of an election. It therefore can be reasonably inferred from the plain language of the article that "procedures similar to those for increases in assessments in the conduct of elections under this subdivision" includes the use of a ballot for property owner fee elections that is similar to one used to register assessment protests as set forth in section 4, subdivision (d). As explained above, that ballot includes voter identification of both the voter's name and the property.

Greene argues that the phrase "procedures similar to those for increases in assessments in the conduct of elections under this subdivision" refers only to

the procedures to conduct the election exclusively by mail,[5] and not to the contents or features of the ballot. He cites no authority for this narrow reading, either in the language, the ballot arguments, or any other available legislative history. If what section 6 could borrow from section 4 were confined to mail-in ballots, one would expect appropriately narrow language, rather than the open-ended, plural "procedures similar to."

Greene argues that the adoption of the requirement that a property owner/voter identify himself and his property on the ballot makes sense only in the context of weighted voting, and further argues that section 6 does not permit weighted voting. The resolution of the question whether section 6 authorizes weighted voting is not immediately clear. On the one hand, section 6, subdivision (c) refers to a fee increase "approved by a majority vote of the property owners of the property subject to the fee," which Greene argues would preclude weighted voting. (But see *Musicians Federation v. Wittstein* (1964) 379 U.S. 171, 176, 172 [13 L.Ed.2d 214, 85 S.Ct. 300] ["fair import" of phrase " 'by majority vote of the delegates voting at a regular convention' " includes "weighted" voting].) On the other hand, the reference in that subdivision to "procedures similar to those for increases in assessments in the conduct of elections" (art. XIII D, § 6, subd. (c)) may arguably include weighted voting procedures.

■ We need not decide this question, however, because the answer does not affect the resolution of the issue presented. The District did not employ weighted voting in this case. Rather, we disagree with Greene's premise that the nonsecret voting procedures of section 4 must apply only to weighted voting elections. Greene argues in effect that whereas weighted voting may require voter self-identification, property owner elections in which each parcel has one vote must be conducted with a secret ballot in the manner prescribed in the Elections Code for mail-in and absentee ballots, in which the identifying information is not placed on the ballot itself but on the envelope enclosing the ballot. (See Elec. Code, §§ 3011, 3019, 4100; see also *Peterson v. City of San Diego* (1983) 34 Cal.3d 225, 227 [193 Cal.Rptr. 533, 666 P.2d 975] (*Peterson*).) Whether one-parcel, one-vote property owner elections are less amenable to the Elections Code procedures is unclear. It may be that this type of nonsecret voting is efficacious in verifying the qualification of property owner/voters and dealing with situations in which

---

[5] Elections Code section 4000, the statute that governs the conduct of elections wholly by mail, was enacted in 1994 and provided, and still provides, for elections by mail only in some enumerated circumstances, such as when no more than 1,000 registered voters are eligible to participate. (Stats. 1994, ch. 920, § 2, pp. 4690, 4754–4755.) That statute was amended in 1997 by the same enactment that added section 53753, discussed above, to provide that all elections and assessment balloting conducted pursuant to articles XIII C and XIII D may be conducted exclusively by mail. (Stats. 1997, ch. 38, § 2, p. 365, adding Elec. Code, § 4000, former subd. (c)(9).)

more than one vote is cast for a given property, which can occur, for example, if there is more than one record owner of a given property or the record owner is not the actual current owner. Moreover, as discussed above, it is not clear that weighted voting *requires* nonsecret elections. What is clear is that article XIII D, section 4, does authorize ballots on which voters are required to identify themselves and section 6 authorizes election procedures "similar to" section 4. Therefore, in the absence of explicit language or legislative history to the contrary, we conclude section 6 also authorizes a ballot with voter self-identification, irrespective of whether weighted voting is used.[6]

We therefore conclude that article XIII D, section 6, subdivision (c) authorizes government agencies to require property owners to identify themselves and their parcels on the ballot on which they indicate how they are casting their votes. The fact that such identification is authorized under article XIII D, however, does not mean that fee elections are devoid of secrecy requirements. Although "procedures . . . for increases in assessments" in section 6, subdivision (c) refers to section 4 of that article, it may also be reasonably read to include procedures subsequently devised by the Legislature to implement section 4 that are consistent with that section. Thus, it may be read to include the requirement of section 4 that ballots remain secret at least until the time they are tabulated. Furthermore, it may be the case that some secrecy requirements apply in section 6 elections even during and after ballot tabulation. After all, the provision in section 53753, subdivision (e) that the assessment protest ballots become public records after they are tabulated at a public hearing, may not apply to section 6 ballots, wherein such a method of tabulation is not required.

We need not decide these questions, because it is undisputed that the District protected ballot secrecy before the ballots were tabulated and that their procedures provided for allowing the inspection of the ballots by the public only pursuant to court order. The Court of Appeal acknowledged the secrecy of the District's procedures, and stated that "[t]hese procedures, if followed, might have been sufficient to preserve the secrecy of the voting."

---

[6] The Howard Jarvis Taxpayers Association (Association), the principal sponsor of Proposition 218 (see Morain & Slater, *Cities Brace for Tighter Budgets After Prop. 218*, L.A. Times (Nov. 7, 1996) p. A1), filed an amicus curiae brief on behalf of Greene, relying in large part on the above argument about weighted voting. As we have stated: "The opinion of drafters or of legislators who sponsor an initiative is not relevant since such opinion does not represent the intent of the electorate and we cannot say with assurance that the voters were aware of the drafters' intent." (*Taxpayers to Limit Campaign Spending v. Fair Pol. Practices Com.* (1990) 51 Cal.3d 744, 765, fn. 10 [274 Cal.Rptr. 787, 799 P.2d 1220].) As discussed above, we do not find support for the Association's position in the language or ballot materials, nor in the section 53753 implementing legislation.

The Court of Appeal nonetheless invalidated the election, reasoning as follows: "[I]nsofar as the record indicates, voters were not provided any assurances that their votes would remain confidential both before and after tabulation of the ballots. Although the election procedures were public documents, they were not mailed to voters and the materials provided to voters to describe the election procedures (and included in the record) did not assure them of voting secrecy. Voters who are required to cast their votes on ballots that disclose their names and identify the property they own and that must be signed to be counted, and who are not provided assurances that their votes will be kept permanently confidential, may reasonably be said to have been 'denied their right to vote' (Elec. Code, § 16100, subd. (e)) as that right is protected by article II, section 7. That is, they have been denied their right to vote freely with the confidence that their votes will remain secret before and after tabulation of the ballots."

We disagree. Proposition 218 together with its subsequent implementing legislation provides specific, sui generis procedures for conducting assessment protest balloting, and permits local government agencies to use similar procedures in conducting fee elections. Nowhere in either section 4 or section 6 of article XIII D, nor in section 53753, are such assurances required. Nor does article II, section 7, on its face, require such assurances.

This is not to say that such notice may not be provided, nor that it is not desirable. But the fact that a court may devise in retrospect a procedure that would have increased the perception of ballot secrecy does not mean that the failure to adopt such a procedure requires invalidation of the election. Section 6, subdivision (c) by its plain terms was intended to provide a safe harbor for localities that conduct fee elections using procedures similar to the procedures prescribed for assessment balloting. We conclude that because the District adopted such procedures, the election was therefore lawful.[7]

In arriving at the contrary conclusion, the Court of Appeal focused, and Greene now focuses, on the use of the words "vote" and "election" in the Proposition 218 ballot pamphlet. The Court of Appeal noted that the Legislative Analyst's analysis of the initiative used the words "election" and "vote" for both the assessment balloting procedure and for fee elections. (See Ballot

---

[7] As noted, we recognize the Elections Code provides that, in the case of mail-in and absentee ballots, information identifying the voter be on an envelope that allows election officials to verify the voter's qualification, but that the ballot itself contains no identifying information. (See Elec. Code, §§ 3011, 3019, 4100; see also Peterson, supra, 34 Cal.3d at p. 227.) We do not suggest that the procedures employed by the District in the present case are the equivalent of the procedures prescribed in the Elections Code, nor that the District's procedures would pass muster under article II, section 7. We hold only that section 6, subdivision (c) authorized the District to devise such a ballot and such procedures for fee elections.

Pamp., Gen. Elec. (Nov. 5, 1996) analysis by Legis. Analyst, Prop. 218, pp. 73–74.) The court further stated: "The overwhelming focus of the arguments in support of and in opposition to the initiative was also on the issue of voting rights. Proponents of the measure argued that the initiative would 'guarantee[] your right to vote on local tax increases—even when they are called something else, like "assessments" or "fees" . . . .' (Ballot Pamp., Gen. Elec., *supra*, argument in favor of Prop. 218, p. 76.) After describing how local politicians had used assessments to create loopholes in Proposition 13's requirement of voter approval for taxes, the proponents argued, 'TAX-PAYERS HAVE *NO RIGHT TO VOTE* ON THESE TAX INCREASES AND OTHERS LIKE THEM UNLESS PROPOSITION 218 PASSES!' (Ballot Pamp., at p. 76.) The proponents repeatedly argued that the initiative 'gives taxpayers the right to vote on taxes.' (*Id.* at p. 77.) Opponents of the measure also focused on voting rights, but alleged that those rights would be infringed because of the property qualification for voting on assessments and the weighting of assessment ballots. The opponents did not suggest that voting rights would be further infringed by the absence of a secret ballot. Neither did the proponents. Voters reading these ballot arguments would reasonably conclude that 'voting rights' were at issue and that those rights arguably were infringed by limiting one's voting rights according to property qualifications and weighted ballots. In other respects, however, voting rights were preserved or enhanced."

The argument proves too much. The proponents in the passage quoted above referred to the right to vote on assessments, and indeed Proposition 218 was designed to do just that. But as discussed above, Proposition 218 did not contemplate a secret ballot in the traditional sense for those casting assessment protests, as is evident from the plain language of article XIII D, section 4. Therefore, the use of the term "vote" in the ballot arguments did not by itself indicate that there would be a secret ballot.

Greene cites dictum in *Bighorn-Desert View Water Agency v. Verjil* (2006) 39 Cal.4th 205, 213 [46 Cal.Rptr.3d 73, 138 P.3d 220] (*Bighorn*): "[W]hen a word has been used in different parts of a single enactment, courts normally infer that the word was intended to have the same meaning throughout." Greene then argues that the term "election" is used in article XIII C, also enacted as part of Proposition 218, to apply to voter approval of special and general taxes, conventional elections that clearly contemplate secret ballots. (See art. XIII C, § 2.) It must therefore be the case, he argues, that "elections" referred to in article XIII D must also contemplate secret ballots.

The problem with this argument is suggested by *Bighorn* itself. In that case, we addressed whether water delivery charges to existing customers were fees or charges within the meaning of article XIII C, section 3, which

authorizes use of the initiative power to reduce or repeal such fees or charges. We stated: "Because article XIII C and article XIII D were enacted together by Proposition 218, it seems unlikely that the terms 'fee' and 'charge' were meant to carry *entirely* different meanings in those two articles, *although some variation in meaning is possible.*" (*Bighorn, supra,* 39 Cal.4th at pp. 213–214, second italics added.) In that case, we further noted that it was possible that the terms "fee" and "charge" did have different meanings in articles XIII C and XIII D, because those terms in the former article did not seem to be limited to "property-related" fees, as they were in the latter article. (*Bighorn,* at pp. 215–216.)

In the present case, the term "election" is a general one in which many variations are possible, and there is no reason to assume procedural uniformity in every statute in which the term is used. Thus, for example, the fee elections in article XIII D, section 6, subdivision (c) authorize limiting the election to only property owners, while most other elections, including elections pertaining to special and general taxes in article XIII C, section 2, do not permit property qualifications. The elections authorized by Proposition 218 may be conducted by mail alone, while most other elections may not be. (Elec. Code, § 4000, subd. (c)(8).) There is no reason to suppose that the term "election" has a core meaning of ballot secrecy when the specific constitutional provisions authorizing the election indicate otherwise.

Nor do we find convincing the argument by Greene and the amici curiae in support of his position that the presumption against implied partial repeal (see *Stop Youth Addiction, Inc. v. Lucky Stores, Inc.* (1998) 17 Cal.4th 553, 569 [71 Cal.Rptr.2d 731, 950 P.2d 1086]) means that we should presume section 6 intended to incorporate article II's secrecy provision. As noted above, our case law has held that property owner elections are generally not subject to constitutional voter secrecy requirements. (See *Tarpey, supra,* 190 Cal. at p. 606; *Alden, supra,* 212 Cal.App.2d at p. 770.)[8] This case law largely undercuts the implied repeal argument, because article XIII D, section 6, subdivision (c) as construed by the District continues rather than repeals existing law pertaining to ballot secrecy.

The Court of Appeal acknowledged the earlier cases, but found them inapposite, relying on our recent opinion in *Silicon Valley Taxpayers' Assn., Inc. v. Santa Clara County Open Space Authority* (2008) 44 Cal.4th 431 [79

---

[8] It is also well established the state constitutional provision prohibiting property qualification for electors and the one-person, one-vote requirement rooted in the state and federal equal protection provisions do not apply to fee and assessment elections conducted by limited purpose government agencies that disproportionately affect certain property owners. (See *Salyer Land Co. v. Tulare Water District* (1973) 410 U.S. 719, 728 [35 L.Ed.2d 659, 93 S.Ct. 1224]; *Southern Cal. Rapid Transit Dist. v Bolen* (1992) 1 Cal.4th 654, 665 [3 Cal.Rptr.2d 843, 822 P.2d 875]; *Potter v. Santa Barbara* (1911) 160 Cal. 349, 355–356 [116 P. 1101].)

Cal.Rptr.3d 312, 187 P.3d 37] (*Silicon Valley*). In *Silicon Valley*, we considered whether judicial review of a government agency's decision to impose an assessment pursuant to Proposition 218 should employ the deferential abuse of discretion standard used for reviewing assessments in pre-Proposition 218 cases, or if Proposition 218 required independent review. Our task was to interpret article XIII D, section 4, subdivision (f), which states: "In any legal action contesting the validity of any assessment, the burden shall be on the agency to demonstrate that the property or properties in question receive a special benefit over and above the benefits conferred on the public at large and that the amount of any contested assessment is proportional to, and no greater than, the benefits conferred on the property or properties in question." Our review of the arguments in favor of Proposition 218 indicated that this provision was intended to overturn the line of cases, most recently our decision in *Knox v. City of Orland, supra*, 4 Cal.4th 132, that held a deferential review of local government assessments was required. (*Silicon Valley, supra*, 44 Cal.4th at pp. 445–446.) We further concluded that the primary basis for deferential review, separation of powers and judicial deference to legislative acts, no longer applied after Proposition 218, a constitutional amendment designed to limit local legislative power. (*Silicon Valley, supra*, 44 Cal.4th at pp. 447–448.) "Before Proposition 218 became law, special assessment laws were generally *statutory*, and the constitutional separation of powers doctrine served as a foundation for a more deferential standard of review by the courts. But after Proposition 218 passed, an assessment's validity, including the substantive requirements, is now a constitutional question. 'There is a clear limitation . . . upon the power of the Legislature to regulate the exercise of a constitutional right.' [Citation.]" (*Silicon Valley, supra*, 44 Cal.4th at p. 448.)

The Court of Appeal in the present case concluded that "[w]hile the specific holding of *Silicon Valley, supra*, 44 Cal.4th 431, is not directly relevant to this appeal, the court's analysis provides a template for ours. The *Tarpey* line of cases held that article II, former section 5 (now art. II, § 7) and other constitutional provisions governing elections were inapplicable to assessment elections because voter approval procedures for assessments were matters of legislative discretion and were not constitutionally compelled. (See *Tarpey, supra*, 190 Cal. at p. 606.) Under Proposition 218, however, voter approval procedures for assessments and fees now have constitutional status. (Art. XIII D.) The Legislature is no longer free to impose an assessment 'without organizing a district as such at all, and without giving the landowners within the district any voice in the selection of the managers or trustees.' [Citation.] An election now takes place not because of the progressive spirit of the Legislature, but due to the 'compulsion of the law.' [Citation.] Therefore, the rationale of the pre-Proposition 218 cases no longer applies."

The Court of Appeal was correct that "the specific holding of *Silicon Valley, supra,* 44 Cal.4th 431, is not directly relevant to this appeal . . . ," but incorrect in supposing it provides some kind of "template" for the present case. *Silicon Valley* was concerned with the standard of judicial review of local legislative acts, which Proposition 218 had changed by imposing constitutional constraints on local governments that courts were to enforce by heightened scrutiny. Here, the role of courts is not in question: it is undisputed that courts can invalidate elections that are conducted contrary to the provisions of Proposition 218. Nor is there any doubt that Proposition 218 *could have* overruled earlier cases regarding secret balloting in property owner elections; the question is whether it intended to do so. In contrast to *Silicon Valley,* where a specific provision of Proposition 218, article XIII D, section 4, subdivision (f), as well as the accompanying ballot arguments, strongly indicate an intent to overrule earlier cases providing a deferential judicial review standard, here neither the language nor the ballot arguments suggest any intent to overrule earlier cases holding that property owner elections are generally not subject to secret ballot requirements.

The Court of Appeal also reasoned that the uncodified section 5 of Proposition 218 supported its position. As noted, that section states: "The provisions of this act shall be liberally construed to effectuate its purposes of limiting local government revenue and enhancing taxpayer consent." (Prop. 218, § 5; Stats. 1996, p. A-299; also reprinted at Historical Notes, 2A West's Ann. Const., *supra,* foll. art. 13 C, p. 110.) We disagree that section 5 supports the Court of Appeal's holding or Greene's position. It is clear from article XIII D, section 4, that a method of assessment balloting is authorized in which the value of ballot secrecy was to some degree displaced by the value of openness and transparency in the ballot tabulation process. The language of section 6 indicates that local governments were given the discretion to adopt a similar method. We cannot say that this method, striking this particular balance between secrecy and transparency, is less effective in promoting the goals of limiting local government revenue and enhancing taxpayer consent.

■ In sum, the District conducted an election in accord with the literal language of article XIII D, section 6, subdivision (c), using ballots that were substantially similar to those authorized under section 4, and took measures to provide for ballot secrecy notwithstanding the fact that the ballots required the voters to disclose their identities. Regardless of whether secrecy could have or should have been provided in the form of voter assurances or other protective measures, we cannot say that section 6, subdivision (c) requires such measures. We therefore conclude there is no basis for invalidating the fee election at issue here.

## IV. DISPOSITION

The judgment of the Court of Appeal is reversed and the cause is remanded with directions to reinstate the judgment of the trial court denying Greene's election contest.

George, C. J., Kennard, J., Chin, J., Corrigan, J., Reardon, J.,[*] and Raye, J.,[†] concurred.

---

[*] Associate Justice of the Court of Appeal, First Appellate District, Division Four, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

[†] Associate Justice of the Court of Appeal, Third Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.