Filed 3/20/15

See Dissenting Opinion

CERTIFIED FOR PUBLICATION


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA


FOURTH APPELLATE DISTRICT


DIVISION TWO


| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E060028 |
| v. | (Super.Ct.No. RIF148527) |
| JAVANTE MARQUIS SCOTT, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Patrick F. Magers, Judge.

(Retired Judge of the Riverside Super. Ct. assigned by the Chief Justice pursuant to art.

VI, § 6 of the Cal. Const.)  Affirmed.

1

Harry Zimmerman, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Peter Quon, Jr. and Randall D. Einhorn, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant Javante Marquis Scott appeals after the trial court, at a resentencing hearing, imposed the same 120-years-to-life term as at his original sentencing.  Defendant was tried as an adult and convicted of three counts of attempted murder with firearm enhancements.  Defendant contends the sentence is cruel and unusual because it imposes a de facto life sentence on him as a juvenile offender.  The People argue that a new statute, Penal Code section 3051,[1] which guarantees defendant a future parole eligibility hearing, renders the sentence constitutional.  We hold that section 3051 complies with the central constitutional requirement that the State provide a juvenile offender with a meaningful opportunity to obtain release within his or her expected lifetime.  For this reason we affirm.

## FACTS AND PROCEDURAL HISTORY

On February 13, 2009, defendant was 16 years old.  Around 10:00 that night, defendant was riding in a car driven by an adult friend.  He told the friend that he wanted to "dump" some Mexicans, meaning he wanted to shoot or kill someone.  Defendant told

---

[1]  All section references are to the Penal Code unless otherwise indicated.

2

the friend where to drive, pulled a gun from his pocket, and said "Watch this, watch these dicks run."[2] At this time, three Hispanic youths were walking on University Avenue in Riverside on their way to a fast food restaurant. None of the youths were gang members. Defendant fired four shots at the youths, hitting one in the lower back and seriously injuring him.

At trial, defendant admitted firing the shots, but testified that he did so only because the driver of the car told him to and that he "didn't intend to hit nobody."

Evidence at trial showed that defendant's father and older brother were or had been members of a local Crips gang. Defendant's father was known by the moniker "Tiptoe." Defendant's brother was known by the moniker "Lil' Tiptoe." Although defendant himself did not have any gang tattoos, and he denied gang membership, he had come to be known as "Baby Tiptoe." A gang expert testified at trial that defendant committed the shootings for gang purposes. Defendant wrote rap lyrics about cruising around in a car and shooting rival gang members. His cell phone identified him as "Baby Duke Killa."

On September 15, 2010, the jury convicted defendant of a number of charges and found true a number of enhancement allegations, as follows. First, the jury convicted defendant of three counts of attempted murder (§§ 664/187, subd. (a)), each with a firearm enhancement (§ 12022.53, subds. (d) & (e)) and a gang enhancement (§186.22,

[2] Defendant and other members of his gang referred to members of the Hispanic gang, the Tiny Dukes, as "Tiny Diccs" or just "Diccs."

subd. (b)).  Second, the jury convicted defendant of one count of gang participation (§ 186.22, subd. (a)).  Third, the jury convicted defendant of two counts of assault with a firearm (§ 245, subd. (b)), each with a firearm enhancement (§§ 12022.5, subd. (a), 12022.55) and a gang enhancement (§ 186.22, subd. (b)), and one with a great bodily injury enhancement (§ 12022.7, subd. (a)).

On November 5, 2010, the trial court sentence defendant to 120 years to life in prison, as follows:  15 years to life for each of the three attempted murders, plus 25 years to life for each of the three firearm enhancements, all to run consecutively.  The court imposed a concurrent sentence of three years for the gang participation and imposed but stayed the sentences for the assault counts pursuant to section 654.

Defendant appealed, and in opinion E052276, dated May 17, 2012, this court modified the sentence to stay the term for gang participation pursuant to section 654.

On April 22, 2013, defendant filed a petition for writ of habeas corpus.  Defendant sought resentencing, arguing that the imposition of an indeterminate sentence of 120 years to life is a de facto life sentence, which recent case law from the California Supreme Court held violated the Eight Amendment prohibition against cruel and unusual punishment when imposed on a juvenile for a nonhomicide crime.  On June 28, 2013, the Riverside Superior Court granted the petition, vacated defendant's sentence and ordered the trial court to hold a resentencing hearing.

While the hearing was pending, the Legislature passed, and the governor signed, legislation enacting section 3051, which provides for juvenile offenders in defendant's

4

position to be afforded a parole hearing after a maximum wait of 25 years, depending on the sentence imposed.

At the resentencing hearing held on September 20, 2013, the prosecutor took the position that the enactment of section 3051 cured the constitutional deficiency posed by defendant's sentence. Defense counsel essentially conceded, stating "So he appears to fall within this legislation, and I'll submit to the Court's discretion, Your Honor, as to whether this issue was moot." The trial court accepted the People's argument, found that defendant would be eligible for a parole review in 25 years under section 3051, and resentenced defendant to 120 years to life.

Defendant now appeals.

### DISCUSSION

### I. Standard of Review

The issue presented is whether defendant's sentence violates the constitutional prohibitions against cruel and unusual punishment, as explained in *Graham v. Florida* (2010) 560 U.S. 48 (*Graham*), *Miller v. Alabama* (2012) 567 U.S. ___, 132, S.Ct. 2455 (*Miller*), and *People v. Caballero* (2012) 55 Cal.4th 262 (*Caballero*), or whether the constitutional concerns have been addressed by section 3051. Because the issue is one of constitutional and statutory interpretation, it presents a question of law, which we review de novo. (See *Finberg v. Manset* (2014) 223 Cal.App.4th 529, 532 ["We review de novo questions of interpretation and constitutionality of a statute"]; see also *Greene v. Marin County Flood Control & Water Conservation Dist.* (2010) 49 Cal.4th 277, 287 ["We

5

review questions of law about the meaning of Proposition 218 [adopting provisions of the California Constitution], as other questions of law, de novo"].)

## II. Background: *Graham*, *Miller*, and *Caballero*

We first examine the salient United States and California Supreme Court precedents on the issue of life sentences without parole, both for juveniles convicted of nonhomicide offenses and those convicted of homicide offenses.

In *Graham*, the defendant was convicted of armed burglary with assault or battery, and attempted armed robbery, both committed when he was 16 years old. Although the trial court initially sentenced the defendant to probation, the court later revoked his probation after he violated its terms by committing other crimes. The trial court then imposed the maximum sentence on each count: life imprisonment for the armed burglary, and 15 years for the attempted armed robbery. (*Graham*, *supra*, 560 U.S. at p. 57.) "Because Florida has abolished its parole system, [citation] a life sentence gives a defendant no possibility of release unless he is granted executive clemency." (*Ibid*.)

The United States Supreme Court held that "'the task of interpreting the Eighth Amendment remains [the court's] responsibility.'" (*Graham*, *supra*, 560 U.S. at p. 67.) "The judicial exercise of independent judgment requires consideration of the culpability of the offenders . . . in light of their crimes and characteristics, along with the severity of the punishment in question." (*Ibid*.) The court held that it was clearly established that juveniles have lessened culpability compared to adult offenders. Consequently, they are less deserving of the most severe punishments. "As compared to adults, juveniles have a

'lack of maturity and an underdeveloped sense of responsibility'; they 'are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure'; and their characters are 'not as well formed.'" (*Id*. at p. 68.) The court found it "'difficult even for expert psychologists to differentiate between the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption.'" (*Ibid*.) Juvenile offenders cannot therefore be reliably classified as among the worst offenders. (*Ibid*.)

As to the culpability of the offenders in terms of the crimes and characteristics under review, nonhomicide crimes that do not involve killing, intent to kill, or foreseeing that death could occur "are categorically less deserving of the most serious forms of punishment than are murderers." (*Graham*, *supra*, 560 U.S. at p. 69.) Some nonhomicide crimes do involve very serious harm, but such crimes are not as morally depraved as murder, because of a murder's "'severity and irrevocability.'" (*Ibid*.) "This is because '[l]ife is over for the victim of the murderer,' but for the victim of even a very serious nonhomicide crime, 'life . . . is not over and normally is not beyond repair.'" (*Ibid*.) A juvenile offender "who did not kill or intend to kill has a twice diminished moral culpability," because of both the age of the offender and the nature of the crime. (*Ibid*.)

With respect to punishment, life without the possibility of parole (LWOP) is the second most severe penalty allowed under the law. "Life without parole is an especially harsh punishment for a juvenile. Under this sentence a juvenile offender will on average

7

serve more years of his life in prison than an adult offender. A 16-year-old and a 75-year-old each sentenced to life without parole receive the same punishment in name only." (*Graham*, *supra*, 560 U.S. at p. 70.) The Supreme Court found the penological justifications for such a sentence somewhat lacking with respect to juvenile offenders. The objective of retribution should be directly related to personal culpability. The case for retribution is weaker with a minor as compared to an adult; it is weaker still if the minor did not commit a homicide. (*Id*. at pp. 71-72.) Deterrence also does not justify such a severe sentence. Juveniles are less likely to understand or to be able to take account of deterrence, because of their lack of maturity, underdeveloped sense of responsibility, and lesser ability to consider consequences. "This is particularly so when [the most severe] punishment is rarely imposed." (*Id*. at p. 72.) Incapacitation, a third possible penological goal, also did not justify an LWOP sentence for juvenile nonhomicide offenders. "To justify life without parole on the assumption that the juvenile offender forever will be a danger to society requires the sentencer to make a judgment that the juvenile is incorrigible." The court remarked that such a judgment is questionable, even for expert psychologists, and noted that "'incorrigibility is inconsistent with youth.'" (*Id*. at pp. 72-73.) A penalty of life without parole "forswears altogether the rehabilitative ideal," by "denying the defendant the right to reenter the community," and making "an irrevocable judgment about [the] person's value and place in society." (*Id*. at p. 74.) An LWOP sentence for a juvenile nonhomicide offender is incompatible with rehabilitation as a penological goal. LWOP prisoners are, for example, foreclosed

8

from vocational training or other programs and rehabilitative services that are available to other prisoners. In light of a juvenile's reduced culpability and capacity for change, an LWOP sentence, and concomitant exclusion from rehabilitative opportunities, is inappropriate for juvenile nonhomicide offenders. (*Id*. at p. 74.)

The United States Supreme Court ruled that, although a state is not required to guarantee eventual release to a juvenile nonhomicide offender, "What the State must do, however, is give [juvenile] defendants . . . some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation. It is for the State, in the first instance, to explore the means and mechanisms for compliance." (*Graham*, *supra*, 560 U.S. at p. 75.) The court observed that some juvenile nonhomicide defendants might actually turn out to be incarcerated for life. "Those who commit truly horrifying crimes as juveniles may turn out to be irredeemable, and thus deserving of incarceration for the duration of their lives. The Eighth Amendment does not foreclose the possibility that persons convicted of nonhomicide crimes committed before adulthood will remain behind bars for life. It does forbid States from making the judgment at the outset that those offenders never will be fit to reenter society." (*Ibid*.) The court fashioned a categorical rule that "gives all juvenile nonhomicide offenders a chance to demonstrate maturity and reform. The juvenile should not be deprived of the opportunity to achieve maturity of judgment and self-recognition of human worth and potential. . . . Life in prison without the possibility of parole gives no chance for fulfillment outside prison walls, no chance for reconciliation with society, no hope. Maturity can lead to that considered reflection

which is the foundation for remorse, renewal, and rehabilitation. A young person who knows that he or she has no chance to leave prison before life's end has little incentive to become a responsible individual. In some prisons, moreover, the system itself becomes complicit in the lack of development. As noted above, . . . it is the policy in some prisons to withhold counseling, education, and rehabilitation programs for those who are ineligible for parole consideration. A categorical rule against life without parole for juvenile nonhomicide offenders avoids the perverse consequence in which the lack of maturity that led to an offender's crime is reinforced by the prison term." (*Id*. at p. 79.) The United States Supreme Court held that "[t]he Constitution prohibits the imposition of a life without parole sentence on a juvenile offender who did not commit homicide. A State need not guarantee the offender eventual release, but if it imposes a sentence of life it must provide him or her with some realistic opportunity to obtain release before the end of that term." (*Id*. at p. 82.)

In *Miller*, the United States Supreme Court addressed the imposition of LWOP terms for juveniles who were convicted of homicide offenses. The court held that "mandatory life without parole for those under the age of 18 at the time of their crimes violates the Eighth Amendment's prohibition on 'cruel and unusual punishments.'" (*Miller*, *supra*, 132 S.Ct. at p. 2460.)

The court began with the principle that "children are constitutionally different from adults for purposes of sentencing. Because juveniles have diminished culpability and greater prospects for reform, we explained, 'they are less deserving of the most

10

severe punishments.'" (*Miller*, *supra*, 132 S.Ct. at p. 2464.)  The United States Supreme Court line of precedents on that issue set out "three significant gaps between juveniles and adults.  First, children have a '"lack of maturity and an underdeveloped sense of responsibility,"' leading to recklessness, impulsivity, and heedless risk-taking.  [Citation.]  Second, children 'are more vulnerable . . . to negative influences and outside pressures,' including from their family and peers; they have limited 'contro[l] over their own environment' and lack the ability to extricate themselves from horrific, crime-producing settings.  [Citation.]  And third, a child's character is not as 'well formed' as an adult's; his traits are 'less fixed' and his actions less likely to be 'evidence of irretrievabl[e] deprav[ity].'  [Citation.]"  (*Ibid.*)  The *Miller* court stated, "To be sure, [the] flat ban on life without parole applied [in *Graham*, *supra*, 560 U.S. 48] only to nonhomicide crimes, and the Court took care to distinguish those offenses from murder, based on both moral culpability and consequential harm.  [Citation.]  But none of what it said about children— about their distinctive (and transitory) mental traits and environmental vulnerabilities—is crime-specific.  Those features are evident in the same way, and to the same degree, when [e.g.,] a botched robbery turns into a killing.  So *Graham*'s reasoning implicates any life-without-parole sentence imposed on a juvenile, even as its categorical bar relates only to nonhomicide offenses."  (*Miller*, *supra*, 132 S.Ct. 2455 at p. 2465.)

Sentencing schemes that mandate LWOP for juveniles tried as adults "prevent the sentence from taking account of these central considerations.  By removing youth from the balance—by subjecting a juvenile to the same life-without-parole sentence applicable

11

to an adult—these laws prohibit a sentencing authority from assessing whether the law's harshest term of imprisonment proportionately punishes a juvenile offender. That contravenes *Graham*'s . . . foundational principle: that imposition of a State's most severe penalties on juvenile offenders cannot proceed as though they were not children." (*Miller*, *supra*, 132 S.Ct. 2455 at p. 2466.)

In making its categorical rule, that LWOP sentences cannot be imposed upon juveniles, *Graham* analogized the effect of the LWOP sentence on juveniles to the death penalty. That analogous correspondence made relevant "a second line of our precedents, demanding individualized sentencing when imposing the death penalty." (*Miller*, *supra*, 132 S.Ct. 2455 at p. 2467.) The United States Supreme Court found of special significance "that a sentencer have the ability to consider the 'mitigating qualities of youth.' [Citation.]" (*Ibid*.) Mandatory LWOP sentencing was flawed because it, "by [its] nature, preclude[d] a sentencer from taking account of an offender's age and the wealth of characteristics and circumstances attendant to it. Under these schemes, every juvenile will receive the same sentence as every other—the 17-year-old and the 14-year-old, the shooter and the accomplice, the child from a stable household and the child from a chaotic and abusive one. And still worse, each juvenile . . . will receive the same sentence as the vast majority of adults committing similar homicide offenses—but really, as *Graham* noted, a *greater* sentence than those adults will serve." (*Miller*, *supra*, 132 S.Ct. 2455 at pp. 2467-2468.) The court declined to make a categorical bar on LWOP sentences for juveniles who commit homicide crimes, but, given its relevant decisions in

other cases, the court opined that "appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon. That is especially so because of the great difficulty . . . of distinguishing at this early age between 'the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption.' [Citations.] Although we do not foreclose a sentencer's ability to make that judgment in homicide cases, we require it to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." (*Id*. at p. 2469.) Individualized sentencing is required when imposing the harshest penalties. The court stated, in its conclusion, that "a judge or jury must have the opportunity to consider mitigating circumstances before imposing the harshest possible penalty for juveniles." (*Id*. at p. 2475.)

In *Caballero, supra*, 55 Cal.4th 262, the California Supreme Court considered the sentence for a 16-year-old juvenile who had fired a gun at three members of a rival gang. Two of the victims were unhurt; the third was injured but survived. The defendant was convicted of three counts of attempted murder, plus enhancements for personal discharge of a firearm, gang enhancements, and a great bodily injury enhancement as to one victim. He received a sentence of 15 years to life for the first attempted murder, plus 25 years to life for the firearm enhancement. He was sentenced to a consecutive term of 15 years to life for the second attempted murder count, plus 20 years for the firearm enhancement. He was sentenced to another consecutive term of 15 years to life on the third attempted

murder count, plus 20 years for the firearm enhancement. The defendant's total term was 110 years to life. (*Id*. at p. 265.)

The California Supreme Court determined that the sentence of 110 years to life was the functional equivalent of an LWOP sentence, and was governed by *Graham*'s ban on LWOP sentences for juveniles in nonhomicide cases. (*Caballero*, *supra*, 55 Cal.4th at pp. 267, fn. 3, 268.) The defendant would become parole-eligible only after serving 110 years according to section 3046, subdivision (b). (*Caballero,* at p. 268.) "*Graham*'s analysis does not focus on the precise sentence meted out. Instead . . . it holds that a state must provide a juvenile offender 'with some realistic opportunity to obtain release' from prison during his or her expected lifetime." (*Ibid*.) The Supreme Court concluded that "sentencing a juvenile offender for a nonhomicide offense to a term of years with a parole eligibility date that falls outside the juvenile offender's natural life expectancy constitutes cruel and unusual punishment in violation of the Eighth Amendment. Although proper authorities may later determine that youths should remain incarcerated for their natural lives, the state may not deprive them at sentencing of a meaningful opportunity to demonstrate their rehabilitation and fitness to reenter society in the future. Under *Graham*'s nonhomicide ruling, the sentencing court must consider all mitigating circumstances attendant in the juvenile's crime and life, including but not limited to his or her chronological age at the time of the crime, whether the juvenile offender was a direct perpetrator or an aider and abettor, and his or her physical and mental development, so that it can impose a time when the juvenile offender will be able to seek

parole from the parole board." (*Id*. at pp. 268-269.) The court ordered that juvenile offenders who had received LWOP or de facto equivalent sentences for nonhomicide crimes would be eligible to petition for writs of habeas corpus, "in order to allow the [trial] court to weigh the mitigating evidence in determining the extent of incarceration required before parole hearings. Because every case will be different, we will not provide trial courts with a precise timeframe for setting these future parole hearings in a nonhomicide case. However, the sentence must not violate the defendant's Eighth Amendment rights and must provide him or her a 'meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation' under *Graham*'s mandate." (*Id*. at p. 269.)

### III. Legislative Response: Senate Bill No. 260 (2013–2014 Reg. Sess.)

The Legislature, in response, enacted Senate Bill No. 260 (2013–2014 Reg. Sess.). The bill, which became effective January 1, 2014, added section 3051, which provides an opportunity for most juvenile offenders to obtain a parole hearing within their expected lifetimes.

Section 3051, subdivision (b)(1), provides that a youth offender sentenced to a determinate sentence, "shall be eligible for release on parole at a youth offender parole hearing by the board during his or her 15th year of incarceration, unless previously released pursuant to other statutory provisions." Section 3051, subdivision (b)(2), provides that a youth offender sentenced to a life term of less than 25 years to life, "shall be eligible for release on parole by the board during his or her 20th year of incarceration

15

at a youth offender parole hearing," unless otherwise released or entitled to earlier parole consideration under other provisions. And section 3051, subdivision (b)(3), provides that a youth offender sentenced to a term of 25 years to life, "shall be eligible for release on parole by the board during his or her 25th year of incarceration at a youth offender parole hearing," unless otherwise released or is eligible for an earlier parole hearing date under other provisions.

As a result of this new provision, most youth offenders would be eligible for a parole hearing after a maximum of 25 years of incarceration, within the normal life expectancy of a juvenile. It does not apply, however, to three strikes sentences, one strike sentences, or LWOP sentences, or to those who commit certain additional offenses after reaching the age of 18. (§ 3051, subd. (h).)

Section 3051, subdivision (e), states that, "The youth offender parole hearing to consider release shall provide for a meaningful opportunity to obtain release. The board shall review and, as necessary, revise existing regulations and adopt new regulations regarding determinations of suitability made pursuant to this section, subdivision (c) of Section 4801, and other related topics, consistent with relevant case law, in order to provide that meaningful opportunity for release." Section 4801, subdivision (c), in turn, provides: "(c) When a prisoner committed his or her controlling offense . . . prior to attaining 18 years of age, the board, in reviewing a prisoner's suitability for parole pursuant to Section 3041.5, shall give great weight to the diminished culpability of juveniles as compared to adults, the hallmark features of youth, and any subsequent

16

growth and increased maturity of the prisoner in accordance with relevant case law." Section 3051, subdivision (f), echoes and expands on the requirements of section 4801, subdivision (c): "(1) In assessing growth and maturity, psychological evaluations and risk assessment instruments, if used by the board, shall be administered by licensed psychologists employed by the board and shall take into consideration the diminished culpability of juveniles as compared to that of adults, the hallmark features of youth, and any subsequent growth and increased maturity of the individual. [¶] (2) Family members, friends, school personnel, faith leaders, and representatives from community-based organizations with knowledge about the individual before the crime or his or her growth and maturity since the time of the crime may submit statements for review by the board. [¶] (3) Nothing in this section is intended to alter the rights of victims at parole hearings." (§ 3051, subd. (f).)

In enacting section 3051, the Legislature made the following declaration of intent: "The Legislature finds and declares that, as stated by the United States Supreme Court in *Miller v. Alabama* (2012) 183 L.Ed.2d 407, 'only a relatively small proportion of adolescents' who engage in illegal activity 'develop entrenched patterns of problem behavior,' and that 'developments in psychology and brain science continue to show fundamental differences between juvenile and adult minds,' including 'parts of the brain involved in behavior control.' The Legislature recognizes that youthfulness both lessens a juvenile's moral culpability and enhances the prospect that, as a youth matures into an adult and neurological development occurs, these individuals can become contributing

17

members of society. The purpose of this act is to establish a parole eligibility mechanism that provides a person serving a sentence for crimes that he or she committed as a juvenile the opportunity to obtain release when he or she has shown that he or she has been rehabilitated and gained maturity, in accordance with the decision of the California Supreme Court in *People v. Caballero* (2012) 55 Cal.4th 262 and the decisions of the United States Supreme Court in *Graham v. Florida* (2010) 560 U.S. 48, and *Miller v. Alabama* (2012) 183 L.Ed.2d 407. Nothing in this act is intended to undermine the California Supreme Court's holdings in *In re Shaputis* (2011) 53 Cal.4th 192, *In re Lawrence* (2008) 44 Cal.4th 1181, and subsequent cases. It is the intent of the Legislature to create a process by which growth and maturity of youthful offenders can be assessed and a meaningful opportunity for release established." (Stats. 2013, ch. 312, § 1.)

The People urge that the enactment of section 3051 moots defendant's claim that his Eighth Amendment rights were violated, because there are no longer any de facto sentences of life imprisonment without parole for most youthful offenders, inasmuch as some meaningful parole opportunity will be offered after a maximum of 25 years' imprisonment. Defendant argues that section 3051 does not obviate the requirements set forth in *Graham*, *Miller* and *Caballero* that the trial court must take account of the offender's status as a juvenile in selecting the sentence to be imposed. Some courts reaching the issue have followed the line of reasoning propounded by the People, that section 3051 satisfies the mandates of *Graham*, *Miller*, and *Caballero*. A different line of

18

cases has determined that the enactment of section 3051 operates as an ultimate safety net on the command that juvenile offenders be afforded some meaningful opportunity for release during their lifetimes, but that the requirements of *Graham*, *Miller*, and *Caballero* mandate that the sentencing court take account of the offender's status as a juvenile, with its attendant lessening of culpability, in imposing sentence in the first instance. The issue is pending before the California Supreme Court, which has granted review as to both lines of cases.

IV. <u>Sentencing for Juvenile Offenders Must Satisfy the Central Constitutional Requirement Set Forth in the United States Supreme Court and California Supreme Court Precedents—A Meaningful Opportunity To Obtain Release Within the Expected Lifetime Based on Demonstrated Maturity and Rehabilitation.</u>

We have examined the relevant foundational precedents (e.g., *Graham*, *Miller*, and *Caballero*), and we discern the following rules or standards with respect to imposing LWOP sentences on offenders whose commitment offense occurred when they were a juvenile.

First, *Graham* imposed a categorical ban on LWOP sentences for nonhomicide offenses committed by juveniles. The State must provide such juvenile defendants "some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation. It is for the State, in the first instance, to explore the means and mechanisms for compliance." (*Graham*, *supra*, 560 U.S. 48 at p. 75.) Although the dissent cites *Graham* as mandating an individualized sentencing decision by the trial

19

court, this requirement is in fact nowhere to be found in *Graham*. What *Graham* actually mandates is, as stated above, the chance to obtain release base on *demonstrated maturity and rehabilitation*. This crucial determination cannot in most cases be achieved at sentencing because the juvenile offender will not yet have had to opportunity to exhibit these traits. Rehabilitation and maturity await the passage of time before they can reliably reveal themselves, and this is precisely what *Graham* directs. Further, as it considers whether LWOP sentences can constitutionally be imposed on juveniles for nonhomicide offenses, the *Graham* court actually discounts the general reliability of an individualized sentencing determination at trial as opposed to a guaranteed parole hearing for a juvenile defender in the future. The court points to the following deficiencies risked by case-by-case consideration at sentencing: (1) the accuracy and reliability of a sentencing choice are compromised when the brutality of a particular crime overpowers the considerations of youth, immaturity and vulnerability; (2) the immaturity of the juvenile, described in detail in *Graham* is "likely to impair the quality of a juvenile defendant's representation"; and (3) the juvenile nonhomicide offender must be given "a chance to demonstrate maturity and reform." (*Id*. at pp.77-79) *Graham* simply does not mandate an individual sentencing determination at trial. Rather, *Graham* stresses the central importance of allowing a juvenile offender to demonstrate his or her rehabilitation and maturity, after the passage of time, at a guaranteed parole hearing. This is the remedy provided by section 3051.

Second, *Caballero* extended the *Graham* ban to include not only explicit LWOP sentences but also de facto LWOP sentences. A de facto LWOP sentence is one that is not explicitly designated a life sentence, but in which a juvenile offender's "parole eligibility date . . . `falls outside his or her natural life expectancy." (*Caballero, supra,* 55 Cal.4th at pp. 262, 291.) Defendant's sentence in this case, 120 years to life, is a de facto LWOP sentence.

Third, *Miller* imposes a ban on *mandatory* LWOP for homicide crimes committed by juveniles. To implement this ban, *Miller* requires the sentencing court to provide an individualized sentencing determination, "considering an offender's youth and attendant characteristics" before imposing LWOP in homicide cases. The *Miller* court declines to extend *Graham's* categorical ban on LWOP sentences to juvenile homicide offenders, choosing instead to mandate the individualized sentencing to safeguard a juvenile offender's Eighth Amendment Rights. (*Miller, supra,* 132 S.Ct. 2455 at p. 2465.) We note that *Miller* does not state that its holding applies to nonhomicide cases. This is not surprising because, as *Miller* acknowledges, *Graham* bans LWOP in nonhomicide cases. We disagree with the dissent's conclusion that *Miller* requires the trial court to make an individualized sentencing decision as to juvenile offenders before imposing a *de facto* LWOP sentence in a nonhomicide case. *Miller* devised its individualized sentencing scheme to safeguard juvenile defendants convicted of *homicide* offenses from receiving a *mandatory* LWOP sentence. *Miller* does not impose such a scheme as a constitutional

21

requirement where, after *Caballero,* a juvenile nonhomicide offender can no longer receive an LWOP sentence.

To reiterate, after *Graham* and *Caballero,* both LWOP and *de facto* LWOP have been eliminated as possible sentencing choices for juveniles who commit nonhomicide crimes. The possibility that a juvenile can receive the "State's harshest penalties" is the *Miller* court's clearly stated rationale for the individualized sentencing mandate. This possibility no longer exists in California for a juvenile convicted of a nonhomicide crime. For this reason, section 3051 is fully consistent with *Miller.*

Fourth, while *Caballero* does envision an individualized determination at sentencing like the one set forth for homicide cases in *Miller*, the focal point of *Caballero* is the end result required by *Graham* and by the Eight Amendment—that a juvenile offender must have a reasonable opportunity to obtain parole within his or her lifetime upon a showing of rehabilitation. In fact, the *Caballero* court emphasizes that *Graham* was not focused on "the precise sentence meted out," but rather on the opportunity to obtain release from prison during the juvenile's expected lifetime. (*Caballero, supra,* 55 Cal.4th at p. 268.) Section 3051, as described in detail above, provides just this opportunity no later than 25 years into the sentence, while the typical defendant is in his or her early forties. We recognize that *Caballero* sees the *Graham* ruling being implemented by the trial court at sentencing; that the sentencing court would consider the defendant's individual circumstances to impose a sentence that would allow for parole review within the defendant's expected lifetime. "Under *Graham's* nonhomicide ruling,

22

the sentencing court must consider all mitigating circumstances attendant in the juvenile's crime and life, including but not limited to his or her chronological age at the time of the crime, whether the juvenile offender was a direct perpetrator or an aider and abettor, and his or her physical and mental development . . . ." (*Caballero,* at pp. 268-269.) However, in the very same sentence *Caballero* very clearly identifies the whole point of this entire endeavor: "[S]o that it can impose a time when the juvenile offender will be able to seek parole from the parole board. The Board of Parole Hearings will then determine whether the juvenile offender must be released from prison 'based on demonstrated maturity and rehabilitation.' [Citation.]" (*Id.* at p. 269.) This is precisely what section 3051 accomplishes, following the directive of *Graham* that "It is for the State, in the first instance, to explore the means and mechanisms for compliance." (*Graham*, *supra*, 560 U.S. 48 at p. 75.)

V. Section 3051 Is a Valid and Efficient Mechanism for Providing a Juvenile Nonhomicide Offender With a Meaningful Opportunity for Release

For the following reasons, and based on the case law set forth above, we conclude that the definite parole eligibility schedule, devised by the Legislature, as requested by the *Caballero* court, and described in section 3051, is both constitutionally permissible and an orderly mechanism to provide juveniles convicted as adults of serious nonhomicide crimes with a meaningful opportunity for release within their lifetime.

First, section 3051 has abolished de facto life sentences. *Caballero, supra*, 55 Cal.4th 262, defines a de facto life sentence as "a term of years with a parole eligibility

date that falls outside the juvenile offender's natural life . . . ." (*Id.* at p. 268.) Section 3051 eliminates such sentences altogether by virtue of its provision for mandatory parole eligibility hearings after no more than 25 years in prison.

Second, the California Supreme Court in *Caballero* specifically asked the Legislature to enact a law that works precisely as does section 3051 for prisoners like defendant who are already serving a de facto life term: "We urge the Legislature to enact legislation establishing a parole eligibility mechanism that provides a defendant serving a de facto life sentence without possibility of parole for nonhomicide crimes that he or she committed as a juvenile with the opportunity to obtain release on a showing of rehabilitation and maturity." (*Caballero, supra,* 55 Cal.4th at p. 269, fn. 5.) Again, section 3051 answers this request from the *Caballero* court. Section 3051 "establish[es] a parole eligibility mechanism" that allows such prisoners to obtain parole if they can show "rehabilitation and maturity" after a maximum of 25 years in prison.

Third, section 3051 provides certainty and predictability to both juvenile offenders and sentencing courts. The individualized determination at sentencing that defendant advocates would in practice be far more problematic than section 3051's uniform opportunity for parole after the number of years specified. Section 3051 frees the sentencing courts to follow the existing, familiar if convoluted, sentencing laws that can result in sentences such as defendant's 120-years-to-life term. Without section 3051, sentencing courts tasked with avoiding de facto LWOP sentences would in some instances have to resort to imposing sentences that are not authorized by statute in order

24

to engineer a parole eligibility date that is constitutionally permissible.  Section 3051 allows the current sentencing scheme to continue without upheaval.  The statute simply and clearly makes the current sentencing scheme constitutional by providing each juvenile offender, universally and on a specified schedule, with the meaningful opportunity for release within their lifetime that the Eighth Amendment demands.

**DISPOSITION**

The judgment is affirmed.

CERTIFIED FOR PUBLICATION

RAMIREZ            
P. J.

I concur:

RICHLI          
            J.

[*People v. Javante Marquis Scott*, E060028]

McKINSTER, J.

I respectfully dissent.  Sentencing is a judicial, not an executive function.  (*People v. Clancey* (2013) 56 Cal.4th 562, 574; *People v. Navarro* (1972) 7 Cal. 3d 248, 258 ["The imposition of sentence and the exercise of sentencing discretion are fundamentally and inherently judicial functions"].)  In my view, a sentencing court must satisfy the specific constitutional requirements set forth in the precedents of the United States Supreme Court and the California Supreme Court, when sentencing juvenile offenders.  I agree with the majority that the applicable general rules or standards are to be derived from *Graham*, *Miller*, and *Caballero*,[1] but I differ somewhat as to the purpose and content of the rules, and as to the proper application of the rules and standards to this case.

The following rules or standards apply when the court is considering imposing severe sentences on offenders whose commitment offense occurred when they were juveniles.

First, and antecedent to *Graham* and *Miller*, the United States Supreme Court held in *Roper v. Simmons* (2005) 543 U.S. 551 [161 L.Ed.2d 1, 125 S.Ct. 1183], that a court may not impose capital punishment on juvenile offenders for any offense; to do so violates the Eighth Amendment.  (*Id*. at pp. 578-579.)  This is because juveniles have

---

[1]  *Graham v. Florida* (2010) 560 U.S. 48 [130 S.Ct. 2011, 176 L.Ed.2d 825], *Miller v. Alabama* (2012) 567 U.S. __ [132 S.Ct. 2455, 183 L.Ed.2d 407], and *People v. Caballero* (2012) 55 Cal.4th 262.

1

lessened culpability, so they are less deserving of the most severe punishments.  (*Id.* at p. 569.)

Second, as to juveniles who commit nonhomicide crimes, the United States Supreme Court also made a categorical rule that a court may not sentence a juvenile nonhomicide offender to a life without the possibility of parole (LWOP) term.  (*Graham v. Florida*, *supra*, 560 U.S. 48 at pp. 74-75.)  Juveniles who commit nonhomicide crimes have "twice diminished moral culpability" as opposed to an adult convicted of murder, both because of the nature of the crime, and because of the juvenile's characteristics (e.g., undeveloped moral sense, vulnerability to pressure).  (*Id*. at p. 69.)  A sentence for a juvenile who committed a nonhomicide offense that consists of a term of years with a parole eligibility date that falls outside the juvenile offender's natural life expectancy is likewise prohibited.  (*People v. Caballero*, *supra*, 55 Cal.4th 262 at p. 268.)

Third, *mandatory* LWOP sentences are not permitted for juveniles, even for juveniles who commit a homicide.  (*Miller v. Alabama*, *supra*, 132 S.Ct. 2455 at pp. 2464-2465.)  *Miller* declined to make a categorical rule forbidding imposition of an LWOP sentence on a juvenile who commits homicide, but the United States Supreme Court instructed that the sentencing court must consider the " 'mitigating qualities of youth' " (*id*. at p. 2467); it also said that, "[g]iven all we have said in *Roper*, *Graham*, and this decision about children's diminished culpability and heightened capacity for change, we think appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon.  That is especially so because of the great difficulty . . . of

2

distinguishing at this early age between 'the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption.' [Citations.] Although we do not foreclose a sentencer's ability to make that judgment in homicide cases, we require it to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." (*Miller v. Alabama*, *supra*, 132 S.Ct. 2455 at p 2469.)

The hallmark of all these cases is a requirement for individualized sentencing for juveniles. The United States Supreme Court itself recognized such a duty in *Miller v. Alabama*: All the "individualized sentencing cases [*sic*] alike teach that in imposing a State's harshest penalties, a sentencer misses too much if [it] treats every child as an adult." (*Miller v. Alabama*, *supra*, 132 S.Ct. 2455 at p. 2468.) That is why the imposition of such "harshest penalties" on a juvenile should be rare; that is why the Supreme Court mandates taking into account, at sentencing, the inherently diminished culpability of juvenile offenders.

Under Penal Code section 3046, subdivision (b), defendant here would ordinarily be required to serve the minimum term of 120 years of his 120-year-to-life sentence before becoming parole eligible.[2] It is only because of the enactment of Senate Bill

---

[2] Penal Code section 3046 provides in part: "(a) No prisoner imprisoned under a life sentence may be paroled until he or she has served the greater of the following: [¶] (1) A term of at least seven calendar years. [¶] (2) A term as established pursuant to any other provision of law that establishes a minimum term or minimum period of confinement under a life sentence before eligibility for parole. [¶] (b) If two or more life sentences are ordered to run consecutively to each other pursuant to Section 669, no

*[footnote continued on next page]*

3

No. 260 that defendant will be afforded an earlier eligibility date for a youthful offender parole hearing.

Under the majority's view, the new provisions of Penal Code section 3051 would allow trial courts to avoid the evaluation of a juvenile defendant at the time of sentencing that is mandated by *Graham*, *Miller*, and *Caballero*, ostensibly because the Board of Parole Hearings will engage in the required assessment at a future time. I respectfully disagree with this assessment and analysis.

Although the Legislature is entitled to great deference in terms of setting the punishment for criminal behavior, ""'"the final judgment as to whether the punishment [the Legislature] decrees exceeds constitutional limits is a judicial function."''" (*People v. Dillon* (1983) 34 Cal.3d 441, 478.) The holdings of *Graham*, *Miller*, and *Caballero* teach that it is the court that must make the individualized sentencing decision as to juvenile offenders. The legislative remedy proposed by the enactment of Senate Bill No. 260 in essence delays the determination of the relevant considerations for 25 years, and places that delayed determination in the hands of the executive branch, rather than in the hands

---

*[footnote continued from previous page]*
prisoner so imprisoned may be paroled until he or she has served the term specified in subdivision (a) on each of the life sentences that are ordered to run consecutively."

The provision was amended in Senate Bill No. 260 to add subdivision (c): "(c) Notwithstanding subdivisions (a) and (b), a prisoner found suitable for parole pursuant to a youth offender parole hearing as described in Section 3051 shall be paroled regardless of the manner in which the board set release dates pursuant to subdivision (a) of Section 3041, subject to subdivision (b) of Section 3041 and Sections 3041.1 and 3041.2, as applicable." (Stats. 2013, ch. 312, § 3.)

4

of the sentencing court. The courts should not, and may not, abdicate their responsibility to take account of the offender's status as a juvenile in fashioning a constitutional sentence in the first instance. The sentencing court is required to consider all the mitigating circumstances, including the juvenile offender's age, whether the juvenile was a direct perpetrator or an aider and abettor, the circumstances and outside influences that may have affected the juvenile's participation, as well as the juvenile offender's incomplete physical and mental development, and capacity for change, *before* imposing sentence.

Twenty-five years later, the evidence relevant to the sentencing determination—e.g., school records, witnesses who knew the offender's childhood circumstances that may have affected criminality, medical and mental health records—may no longer be available, or memories may have faded so that useful testimony or information cannot be provided.

Here, the record before us does not demonstrate[3] that the trial court undertook any careful review or that it considered any of the relevant circumstances of defendant's status as a juvenile when it initially sentenced defendant to the maximum term of imprisonment—120 years to life—by running all the sentences on each count and enhancement consecutively. The trial court initially granted defendant's petition for writ of habeas corpus for resentencing pursuant to *Graham*, *Miller*, and *Caballero*, but while the matter was pending, the Legislature enacted Penal Code section 3051. At the

_____

[3] We do not have the record or transcript of the initial sentencing.

5

resentencing hearing itself, the court appeared to simply assume that Penal Code section 3051 rendered the petition moot. The court then merely reinstated the original sentence; in reimposing the original sentence, no consideration was given to defendant's status as a juvenile at the time of the offenses, or his background or circumstances. There was nothing to indicate that the trial court had evidence or other good reason to determine that this defendant was one of those rare juvenile offenders who was so irretrievably depraved that he deserved the maximum sentence, 120 years to life.

A sentencing court still retains a separate duty to impose the appropriate sentence for a juvenile offender. The court may not dispense with its responsibility simply because its charge under *Graham v. Florida*, *supra*, 560 U.S. 48, *Miller v. Alabama*, *supra*, 132 S.Ct. 2455, and *People v. Caballero*, *supra*, 55 Cal.4th 262 may be difficult. This is all the more true because there is no guarantee that Senate Bill No. 260 will remain in effect when defendant would finally become eligible to benefit from it. If the trial courts abdicate the responsibility to consider the juvenile offender's circumstances in selecting the sentence in the first instance, the consequences could be catastrophic if Senate Bill No. 260 is later replaced or repealed. Deferral of the appropriate considerations for a period of up to 25 years could easily result in the loss of the only real opportunity to ensure constitutional sentencing. Even with the enactment of a statutory "safety net" provision like Penal Code section 3051, the sentencing court must still abide by the constitutional requirements of the relevant cases in sentencing juvenile offenders.

For these reasons, I believe that the sentence should be reversed. I would have granted defendant a new resentencing hearing, in which consideration must be given to his youth and its associated characteristics, before selecting an appropriate penalty. I would not endeavor to say what sentence should be imposed; the relevant Supreme Court precedents place the duty to make that determination in the hands of the sentencing court. The court may not, however, abdicate its responsibility to take actual account of the offender's juvenile status (and attendant lessened culpability) before imposing such a harsh sentence in the first instance.

For the foregoing reasons, I dissent. I would remand for resentencing in accordance with the requirements of *Graham v. Florida*, *supra*, 560 U.S. 48, *Miller v. Alabama*, *supra*, 132 S.Ct. 2455, and *People v. Caballero*, *supra*, 55 Cal.4th 262, with respect to juvenile offenders.

McKINSTER
J.