Filed 2/9/21

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G057136 |
| v. | (Super. Ct. No. 16NF2644) |
| JOSHUA ACOSTA, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, John Conley, Judge. Affirmed.

Michelle May Peterson, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Arlene A. Sevidal, Randall D. Einhorn, Elizabeth M. Kuchar and Joseph Anagnos, Deputy Attorneys General, for Plaintiff and Respondent.

\*          \*          \*

When he was 21 years old, appellant Joshua Acosta, who has been diagnosed with a form of high-functioning autism spectrum disorder, plotted with his codefendant to kill their friend Katlynn's parents, whom Acosta believed was physically and sexually abusing her. Late one night, Acosta shot and killed Katlynn's parents and a family friend who was at their house. A jury convicted Acosta of three counts of first degree murder and found true the multiple murder special circumstance and firearm enhancements. The trial court sentenced him to three consecutive terms of life without the possibility of parole (LWOP), plus an additional 75 years to life in prison.

Acosta now claims his LWOP sentences are unconstitutional and must be modified to allow for future parole consideration. Much of his challenge concerns Penal Code[1] section 3051, which grants the right to a youth offender parole hearing to juvenile offenders sentenced to LWOP and to juvenile and young adult offenders sentenced to indeterminate or life terms, no matter how lengthy. According to Acosta, section 3051 violates equal protection because it denies young adult offenders sentenced to LWOP, like Acosta, the right to a youth offender parole hearing. Acosta further contends his LWOP sentences violate the Eighth Amendment. We reject these contentions and affirm the judgment.

**FACTS**

At the time of the murders, Acosta was a 21-year-old United States Army mechanic stationed at Fort Irwin. His best friend was his 25-year-old codefendant, Frank Felix.

About a year before the murders, Acosta and Felix met 17-year-old Katlynn G. through the furry community, a worldwide group of cartoon fans who like to

---

[1] All further undesignated statutory references are to this code.

dress up as animals. The trio became good friends. Katlynn and Felix were at times sexually involved.

Katlynn lived in Fullerton with her mother and stepfather, Jen and Chris Yost, and her two younger half-sisters, ages 6 and 9. Katlynn confided to Acosta and Felix that she wanted to run away from home because her stepfather was physically and sexually abusing her. She also talked about killing her stepfather.

Acosta and Felix decided they had to "save" Katlynn and her sisters from further abuse. They came up with a plan to murder Katlynn's parents using a shotgun owned by Felix's father, and then to help Katlynn hide until she turned 18 and could live with Felix.

Later Katlynn texted Acosta that she was going to run away from home and asked him to help her escape. Apparently by chance, Acosta and Felix had planned to execute their murder plot that same night.

Acosta drove to Katlynn's house and went inside, while Felix stayed outside. Acosta then discovered that a family friend named Billy was spending the night; he decided to also kill Billy to keep him "quiet." Katlynn secretly loaded her belongings into Acosta's truck with Felix's help. After everyone was asleep, Katlynn snuck out the front door.

Acosta, who was waiting outside, asked Katlynn if he could use the restroom; he told Katlynn to go to his truck. Acosta entered the house with the shotgun. He walked over to the couch where Billy was sleeping and shot him in the back of the head. Acosta then walked to the master bedroom and shot Jen in the face; he shot Chris as he tried to flee. Acosta, Felix, and Katlynn drove to Felix's house, where they destroyed Katlynn's cellphone so she could not be tracked. They also burned the clothing Acosta wore during the murders.

The next morning, Katlynn's younger sisters woke up to find their parents dead and their sister missing; they called 911. Police officers quickly arrived at the scene and found the victims' bodies.

The police soon informed authorities at Fort Irwin about Acosta's possible involvement in the triple homicide. Military police contacted Acosta in his barracks, retrieved shotgun shells from his pocket, and transported him to the military police station for questioning.

Acosta eventually gave a complete confession and told police where they could find Katlynn. He claimed it was his idea to kill the Yosts; he said he and Felix planned the murders because the Yosts treated Katlynn as a sex toy and a punching bag. They wanted to save her and her young sisters from "two monsters," and Billy was just "collateral."

The district attorney filed an information charging Acosta with three counts of special circumstance first degree murder (§§ 187, subd. (a), 190.2, subd. (a)(3)), with the allegation that he personally discharged a firearm causing death to each victim (§ 12022.53, subd. (d)). Felix was charged as a codefendant and separately tried.

At trial the defense presented evidence that Acosta has a form of high functioning autism spectrum disorder, a condition marked by persistent deficits in social communication and social interaction. According to the defense expert, Acosta is not intellectually disabled, but he is "severely affected from a social-emotional point of view" and functions at the social-emotional level of an 11-year-old, making him easily subject to manipulation. Acosta also has a history of impulsivity due to his attention deficit hyperactivity disorder (ADHD), further compounding the social-emotional deficiencies from his autism spectrum disorder.[2]

_____

[2] Trial testimony suggested Acosta has a number of characteristics indicating he is on the autism spectrum, including a lack of social-emotional reciprocity, odd presentation, unusual grimaces inconsistent with what someone is saying, a flat affect,

4

A jury found Acosta guilty as charged. The trial court sentenced Acosta to three consecutive LWOP terms for the special circumstance murders, plus 75 years to life for the firearm enhancements. At sentencing, the court noted it was "imposing the highest sentence possible under the law" and observed "this is a particularly bad [case]." Acosta appealed.

## DISCUSSION

Acosta's appeal is limited to the propriety of his LWOP sentences. As noted, the trial court sentenced Acosta to three consecutive LWOP terms under section 190.2, subdivision (a): "The penalty for a defendant who is found guilty of murder in the first degree is death or imprisonment in the state prison for life without the possibility of parole if . . . [¶] . . . [¶] [t]he defendant, in this proceeding, has been convicted of more than one offense of murder in the first or second degree." (*Id.* at subd. (a)(3).)

An LWOP sentence "is the second most severe penalty allowed under the law." (*People v. Scott* (2016) 3 Cal.App.5th 1265, 1272.) By effectively guaranteeing death in prison, an LWOP sentence "deprives the convict of the most basic liberties

---

disengagement with conversation, pacing and hand-rubbing (typical self-soothing behaviors for people on the spectrum), stereotypic motor activity such as rocking, a history of social isolation, inability to read social cues, insistence on the sameness in his environment, hyperactivity to sensory input, and a fixation on being right all the time.

Acosta's father, a retired police officer who adopted Acosta and his sisters from a drug addict mother, described Acosta as extraordinarily trusting, lacking in street smarts, and unable to read people or discern their intentions. Acosta's army colleagues testified he was a good soldier, but gullible, unable to understand humor, standoffish, and unable to verbalize facts appropriately. Acosta often spoke to a handmade stuffed My Little Pony, which he needed for comfort; he kept the pony in his barracks and also brought it into the desert for combat training exercises.

The Attorney General concedes the facts pertaining to Acosta's autism were fully developed at trial.

without giving hope of restoration . . . . [Citation.] . . . [It] 'means denial of hope; it means that good behavior and character improvement are immaterial; it means that whatever the future might hold in store for the mind and spirit of [the convict], he will remain in prison for the rest of his days.'" (*Graham v. Florida* (2010) 560 U.S. 48, 69-70 (*Graham*).)

Acosta contends his LWOP sentences must be modified to allow for future parole consideration. He observes that section 3051 affords a youth offender parole hearing to offenders sentenced to determinate or life sentences (no matter how lengthy) for crimes committed when they were 25 or younger (§ 3051, subd. (b)(1)-(3)), and to offenders sentenced to LWOP for crimes committed before they turned 18 (*id.*, subd. (b)(4)), but expressly excludes offenders, like Acosta, who were sentenced to LWOP for crimes committed when they were ages 18 to 25 (*id.*, subd. (h)).[3] According to Acosta, that statutory exclusion precluding young adult LWOP offenders from the

_____

[3] In its current form, the statute provides in pertinent part: "(b)(1) A person who was convicted of a controlling offense that was committed when the person was 25 years of age or younger and for which the sentence is a determinate sentence shall be eligible for release on parole at a youth offender parole hearing during the person's 15th year of incarceration. . . . [¶] (2) A person who was convicted of a controlling offense that was committed when the person was 25 years of age or younger and for which the sentence is a life term of less than 25 years to life shall be eligible for release on parole at a youth offender parole hearing during the person's 20th year of incarceration. . . . [¶] (3) A person who was convicted of a controlling offense that was committed when the person was 25 years of age or younger and for which the sentence is a life term of 25 years to life shall be eligible for release on parole at a youth offender parole hearing during the person's 25th year of incarceration. . . . [¶] (4) A person who was convicted of a controlling offense that was committed before the person had attained 18 years of age and for which the sentence is life without the possibility of parole shall be eligible for release on parole at a youth offender parole hearing during the person's 25th year of incarceration. . . . [¶] . . . [¶] (h) *This section shall not apply* to cases in which sentencing occurs pursuant to Section 1170.12, subdivisions (b) to (i), inclusive, of Section 667, or Section 667.61, or *to cases in which an individual is sentenced to life in prison without the possibility of parole for a controlling offense that was committed after the person had attained 18 years of age. . . .*" (§ 3051, subds. (b)(1)-(4), (h), italics added.)

right to a youthful offender parole hearing violates equal protection.[4] He further contends his LWOP sentences constitute cruel and unusual punishment under the Eighth Amendment.

1.      *Section 3051's Purpose and Legislative History*

Before turning to Acosta's arguments, we review section 3051's purpose and history. The Legislature first enacted section 3051 in 2013 in response to a series of decisions concerning Eighth Amendment limitations on juvenile sentencing. (See *Graham, supra,* 560 U.S. at p. 74 [juvenile who commits nonhomicide offense cannot be sentenced to LWOP]; *Miller v. Alabama* (2012) 567 U.S. 460, 465 (*Miller*) [juvenile who commits homicide offense cannot be sentenced automatically to LWOP]; *People v. Caballero* (2012) 55 Cal.4th 262, 268 (*Caballero*) [juvenile cannot be sentenced to functional equivalent of LWOP for a nonhomicide offense].) These decisions rested in part "on science and social science" (*Miller,* at p. 471), and noted that "developments in psychology and brain science continue to show fundamental differences between juvenile and adult minds" and in the "parts of the brain involved in behavior control" (*Graham,* at p. 68; see *Caballero*, at p. 266).

"[T]he Legislature passed Senate Bill No. 260 explicitly to bring juvenile sentencing into conformity with *Graham*, *Miller*, and *Caballero*." (*People v. Franklin* (2016) 63 Cal.4th 261, 277.) In enacting section 3051, the Legislature explained that "youthfulness both lessens a juvenile's moral culpability and enhances the prospect that, as a youth matures into an adult and neurological development occurs, these individuals can become contributing members of society." (Stats. 2013, ch. 312, § 1.) The bill's

---

        [4]      The statute also excludes youth offenders sentenced under the "One Strike" law (§ 667.61). (§ 3051, subd. (h).) California appellate courts disagree on whether that statutory exclusion is constitutional. (See, e.g., *People v. Williams* (2020) 47 Cal.App.5th 475, 490 [finding no equal protection violation], review granted July 22, 2020, S262229; *People v. Edwards* (2019) 34 Cal.App.5th 183, 197 [finding equal protection violation], review denied July 10, 2019 (*Edwards*).)

stated purpose was "to establish a parole eligibility mechanism that provides a person serving a sentence for crimes that he or she committed as a juvenile the opportunity to obtain release when he or she has shown that he or she has been rehabilitated and gained maturity, in accordance with the decision of the California Supreme Court in [*Caballero*] and the decisions of the United States Supreme Court in [*Graham* and *Miller*]." (*Ibid.*)

As originally enacted, section 3051 only afforded a youth parole eligibility hearing to juvenile offenders, not to young adults. (*In re Trejo* (2017) 10 Cal.App.5th 972, 981 & fn. 6.) It also excluded juveniles who were sentenced to LWOP, since they were already eligible for resentencing under section 1170. (Former § 3051, subd. (h) ["This section shall not apply to cases . . . in which an individual was sentenced to" LWOP], as enacted by Stats. 2013, ch. 312, § 4 (Sen. Bill No. 260).) In the years that followed, however, the Legislature expanded section 3051's provisions on who is eligible for a youth offender parole hearing, "recogniz[ing] that the maturity process does not end at 18 and in many cases extends to at least 25 years of age." (*In re Jones* (2019) 42 Cal.App.5th 477, 484 (conc. opn. of Pollak, J.) (*Jones*).)

In 2015, the Legislature expanded section 3051 to apply to offenders who committed crimes at the age of 23 or younger. (Former § 3051, subd. (a)(1), added by Stats. 2015, ch. 471, § 1 (Sen. Bill No. 261).) The amendment's author cited "[r]ecent scientific evidence on adolescent and young adult development and neuroscience show[ing] that certain areas of the brain—particularly those affecting judgment and decision-making—do not fully develop until the early- to mid-20s." (Sen. Com. on Public Safety, Analysis of Sen. Bill No. 261 (2015-2016 Reg. Sess.) Apr. 28, 2015, p. 3.)

In 2017, the Legislature twice amended section 3051. First, the Legislature further increased the age from 23 to 25, such that offenders serving a determinate or life sentence for crimes committed when they were 25 or younger are now eligible for a youth offender parole hearing. (§ 3051, subd. (b); Stats. 2017, ch. 675, § 1 (Assem. Bill No. 1308).) The amendment's author cited research that the prefrontal cortex, which is

responsible for decision making and impulse control, "doesn't have nearly the functional capacity at age 18 as it does at 25." (Assem. Com. on Public Safety, Analysis of Assem. Bill No. 1308, as amended March 30, 2017 (2017-2018 Reg. Sess.) Apr. 25, 2017, p. 2.)

That same year, the Legislature also amended section 3051 to allow youth offender parole hearings for juveniles—but not young adults—sentenced to LWOP. (§ 3051, subd. (b)(4); Stats. 2017, ch. 684, § 1 (Sen. Bill No. 394).) This amendment was designed to "bring California into compliance with the constitutional requirements of *Miller* and *Montgomery* [*v. Louisiana* (2016) 577 U.S. __ [136 S.Ct. 718] (*Montgomery*)]," which held that *Miller*'s prohibition on mandatory LWOP sentences for juvenile offenders was retroactive. (Sen. Com. on Public Safety, Analysis of Sen. Bill No. 394 (2017-2018 Reg. Sess.) Mar. 21, 2017, p. 4.) The bill sought "to remedy the now unconstitutional juvenile sentences of life without the possibility of parole," without the need for "a resentencing hearing, which is time-consuming, expensive, and subject to extended appeals." (*Id.* at p. 3.)

Thus, in its current form, section 3051 "permit[s] the reevaluation of the fitness to return to society of persons who committed serious offenses prior to reaching full cognitive and emotional maturity," unless the person was "between 18 and 25 years of age when they committed their offense [and] sentenced to life without possibility of parole." (*Jones, supra,* 42 Cal.App.5th at p. 485 (conc. opn. of Pollak, J.).) It therefore "distinguishes both between those who committed their offenses under 18 years of age and those between 18 and 25 years of age, and between offenders 18 to 25 years of age sentenced to prison terms with the possibility of parole and those in the same age group who have been sentenced to life without the possibility of parole." (*Id.* at p. 483 (conc. opn. of Pollak, J.).)

2.    *Equal Protection Analysis*

Acosta asserts section 3051's exclusion of young adult LWOP offenders from the right to a youthful offender parole hearing violates equal protection, first by

9

granting future parole consideration to young adults with any sentence of "X" years to life but not to young adults sentenced to LWOP, and second by granting future parole consideration to juveniles sentenced to LWOP but not to young adults sentenced to LWOP.

"The Fourteenth Amendment to the United States Constitution and article I, section 7 of the California Constitution guarantee all persons the equal protection of the laws." (*Edwards*, *supra*, 34 Cal.App.5th at p. 195.) "'"The first prerequisite to a meritorious claim under the equal protection clause is a showing that the state has adopted a classification that affects two or more *similarly situated* groups in an unequal manner." [Citations.] This initial inquiry is not whether persons are similarly situated for all purposes, but "whether they are similarly situated for purposes of the law challenged."'" (*People v. Morales* (2016) 63 Cal.4th 399, 408.)

If a class of criminal defendants is similarly situated for purposes of the law challenged to another class of defendants who are treated differently, "courts look to determine whether there is a rational basis for the difference." (*Edwards, supra*, 34 Cal.App.5th at p. 195.) "[E]qual protection of the law is denied only where there is no 'rational relationship between the disparity of treatment and some legitimate governmental purpose.' [Citation.] . . . This standard of rationality does not depend upon whether lawmakers ever actually articulated the purpose they sought to achieve. Nor must the underlying rationale be empirically substantiated. [Citation.] While the realities of the subject matter cannot be completely ignored [citation], a court may engage in '"rational speculation"' as to the justifications for the legislative choice [citation]. It is immaterial for rational basis review 'whether or not' any such speculation has 'a foundation in the record.'" (*People v. Turnage* (2012) 55 Cal.4th 62, 74-75 (*Turnage*).)

To successfully challenge a law on equal protection grounds, the defendant must negate "'"every conceivable basis"'" on which "the disputed statutory disparity" might be supported. (*Edwards, supra*, 34 Cal.App.5th at p. 195.) "If a plausible basis

10

exists for the disparity, '[e]qual protection analysis does not entitle the judiciary to second-guess the wisdom, fairness, or logic of the law.'" (*Id*. at pp. 195-196.)

          a.    *Similarly Situated*

We must first decide whether young adult LWOP offenders are similarly situated to young adult offenders sentenced to life and juvenile offenders sentenced to life or LWOP—not for any purpose, but for the purpose of section 3051. We conclude they are.

Section 3051's amendments were designed "to account for neuroscience research that the human brain—especially those portions responsible for judgment and decisionmaking—continues to develop into a person's mid-20s." (*Edwards, supra*, 34 Cal.App.5th at p. 198.) "[T]he purpose of section 3051 is not to measure the extent of punishment warranted by the offense the individual committed but to permit the evaluation of whether, after years of growth in prison, that person has attained the maturity to lead a law-abiding life outside of prison. Both a person sentenced to LWOP for a crime committed while under 18 and a person receiving the same sentence for a crime committed when 18 or slightly older committed their offenses before their character was necessarily 'well formed' and when their judgment and decisionmaking were likely to improve. Both are similarly situated for the purpose of evaluating whether they have outgrown the youthful impulses that led to the commission of their offenses." (*Jones, supra,* 42 Cal.App.5th at pp. 485-486 (conc. opn. of Pollak, J.).)

"Likewise, a person who committed an offense between 18 and 25 years of age serving a sentence permitting parole and a person who committed an offense at the same age serving an LWOP sentence are similarly situated for the purpose of determining whether they have outgrown the youthful impulses that led to the commission of their offenses." (*Jones, supra,* 42 Cal.App.5th at p. 486 (conc. opn. of Pollak, J.).) As between "youth offenders sentenced to LWOP and those sentenced to a parole-eligible life terms," "one could say that both groups committed their crimes before their

prefrontal cortexes reached their full functional capacity, when their characters were not yet fully formed.  Both groups are equally likely to demonstrate improved judgment and decision-making as they reach emotional and cognitive maturity."  (*In re Williams* (2020) 57 Cal.App.5th 427, 435 (*Williams*).)

    b.  *Rational Basis*

    We next must determine whether there is a rational basis for treating young adult LWOP offenders differently than juvenile offenders sentenced to life or LWOP or young adult offenders sentenced to life.  We conclude there is.

    To start, there is a rational basis for distinguishing between juvenile LWOP offenders and young adult LWOP offenders:  their age.  Section 3051 has always excluded young adult LWOP offenders, and until 2017 it also excluded juvenile LWOP offenders.  Section 3051 now affords a youth offender parole hearing to juvenile LWOP offenders to comply with *Montgomery* without resorting to costly resentencing hearings.  (Sen. Com. on Public Safety, Analysis of Sen. Bill No. 394 (2017-2018 Reg. Sess.) Mar. 21, 2017, p. 3.)  The Legislature declined to include young adult LWOP offenders in this amendment, presumably because *Montgomery* did not compel such treatment for young adults.  The Legislature thus had a constitutionally sufficient basis for distinguishing juvenile LWOP offenders from young adult LWOP offenders.  (See also *Roper v. Simmons* (2005) 543 U.S. 551, 574 ["a line must be drawn," and "[t]he age of 18 is the point where society draws the line for many purposes between childhood and adulthood"].)

    There is also a rational basis for distinguishing between a young adult LWOP offender and a young adult offender serving a non-LWOP sentence:  the severity of the crime committed.  "The Legislature has prescribed an LWOP sentence for only a small number of crimes.  These are the crimes the Legislature deems so morally depraved and so injurious as to warrant a sentence that carries no hope of release for the criminal and no threat of recidivism for society.  In excluding LWOP inmates from youth offender

12

parole hearings, the Legislature reasonably could have decided that youthful offenders who have committed such crimes—even with diminished culpability and increased potential for rehabilitation—are nonetheless still sufficiently culpable and sufficiently dangerous to justify lifetime incarceration." (*Williams, supra*, 57 Cal.App.5th at p. 436.)

A special circumstance multiple murder "carries a mandatory sentence of LWOP or death (§ 190.2, subd. (a)), which are the harshest penalties available under our penal system and are reserved for crimes of the most heinous nature." (*Williams, supra*, 57 Cal.App.5th at p. 436.) "The Legislature rationally judged this crime to be more severe and more deserving of lifetime punishment than nonspecial circumstance first degree murder. This judgment is 'both the prerogative and the duty of the Legislature' and '[e]qual protection analysis does not entitle the judiciary to second-guess the wisdom, fairness, or logic' of that judgment." (*Ibid*.) Thus, the statute, on its face, does not violate equal protection.[5]

We do have some reservations about our analysis. After all, in amending section 3051 to encompass young adult offenders, the Legislature expressly recognized that cognitive brain development continues into the early 20s or later, and the parts of the brain that are still developing during this process affect judgment in ways that are highly relevant to criminal behavior. Since the Legislature has determined a 17-year-old who is sentenced to life or LWOP for committing a crime when his or her brain is not yet fully developed should receive a youth offender parole hearing after 25 years of incarceration, a 21-year-old sentenced to LWOP for committing a crime when his or her brain is not yet fully developed should arguably receive the same hearing. We are also mindful of the public policy purpose of the statute, which is to permit the eventual evaluation of a young offender who committed a serious offense before reaching full cognitive and emotional maturity with an eye toward determining whether that individual has become fit to return

---

[5]     Nothing in this opinion precludes Acosta from bringing an "as applied" constitutional challenge to section 3051 via a habeas corpus petition.

to society. Arguably an LWOP offender and a non-LWOP offender are equally capable of gaining maturity, so we question whether the exclusion for young adult LWOP offenders from this process is consistent with the statute's purpose and legislative history.

In the end, however, we cannot insert our own policy concerns into the analysis. As noted, "[e]qual protection analysis does not entitle [us] to second-guess the wisdom, fairness, or logic of the law." (*Turnage, supra*, 55 Cal.4th at p. 74.) Having concluded there is a rational basis for treating young adult LWOP offenders differently, we must reject Acosta's equal protection challenge. Nonetheless, we invite the Legislature to reconsider the provision in question for the reasons discussed above. (See also *People v. Montelongo* (2020) 55 Cal.App.5th 1016, 1039, 1041 (conc. opn. of Segal, J.) [encouraging the Legislature to "rethink" the exclusion, noting "section 3051's current treatment of young adult offenders . . . conflicts with the California Supreme Court decisions that adopted and extended *Miller*"], review denied Jan. 27, 2021, S265597 (*Montelongo*); *Jones, supra*, 42 Cal.App.5th at pp. 486-487 (conc. opn. of Pollak, J.) [noting "there is good reason for legislative reconsideration of the exclusion of young adults serving LWOP sentences from the scope of the statute"].)[6]

3.      *Eighth Amendment Analysis*

Acosta alternatively argues his LWOP sentences violate the Eighth Amendment. According to Acosta, even though he was 21 years old at the time of the murders, his autism spectrum disorder causes him to incur mitigated culpability similar to that of a juvenile under *Miller*. Accordingly, he asks us to modify his sentence to allow him to seek parole eligibility in 25 years akin to a non-LWOP youthful offender.

---

[6]      We also recognize the concurring statement of Justice Liu, issued in conjunction with the Supreme Court's order denying review in *Montelongo*, in which he "join[ed] Justice Segal's suggestion that the Legislature 'reconsider the propriety, wisdom, and perhaps even the constitutionality'" of the exclusion. (*Montelongo, supra*, 55 Cal.App.5th at p. 1041a (stmt. of Liu, J.).)

14

We are not persuaded by Acosta's argument. *Miller* applies to juvenile offenders sentenced to mandatory LWOP terms, not 21 year olds. We are aware of no authority extending *Miller* to encompass young adult LWOP offenders on the autism spectrum, and we decline to take that step.

Acosta intentionally executed three people, leaving their bodies for two young girls to find. The Eighth Amendment does not prohibit a triple LWOP sentence here. (See also *Williams*, *supra,* 57 Cal.App.5th at p. 439 ["If the Eighth Amendment does not prohibit a sentence of death for 21 year olds, then most assuredly, it does not prohibit the lesser LWOP sentence"].)

## DISPOSITION

The judgment is affirmed.

GOETHALS, J.

I CONCUR:

BEDSWORTH, ACTING P. J.

15

Aronson, J., concurring:

I concur with the majority's reasoning and its disposition with one exception: I would not reach the similarly situated prong since a rational basis exists for the Legislature to distinguish between a young adult sentenced to life without the possibility of parole and those not falling into this category, as the majority aptly explains. Consequently, appellant cannot prevail no matter how we resolve the similarly situated prong of an equal protection analysis.

ARONSON, ACTING P. J.

1